**Nathan D. STEIN, appearing by Laurel C. Stein, his guardian ad litem, Respondent,**

v.

**REGENTS OF THE UNIVERSITY OF MINNESOTA, et al., Appellants,**

**Dr. Elke Eckert, et al., Respondents.**

**Alice ALTON, Respondent,**

v.

**UNIVERSITY OF MINNESOTA HOSPITALS, Appellant,**

**John Doe, whose true name is unknown, Defendant.**

**Nos. 49546, 49566 and 49811.**

Supreme Court of Minnesota.

July 27, 1979.

---

Geraghty, O'Loughlin & Kenney, James W. Kenney and David C. Hutchinson, St. Paul, R. Joel Tierney, Minneapolis, for Regents of University of Minnesota, University of Minnesota Hospitals, and John Westerman.

DeParcq, Anderson, Perl, Hunegs & Rudquist, Richard G. Hunegs and Peter W. Riley, Minneapolis, for Stein.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson, II, Minneapolis, for Dr. Elke Eckert et al.

Van Eps & Gilmore and Warren P. Eustis, Minneapolis, for Dr. Elke Eckert.

Charles W. Anderson, Minneapolis, for Alice Alton.

PER CURIAM.

This is a consolidation of two appeals by University of Minnesota Hospitals (Hospitals) from orders of Hennepin County District Court, denying motions to amend earlier orders striking the defense of sovereign immunity.[1] We affirm in both actions.

In both of these cases, plaintiffs seek to recover damages for injuries sustained as a

---

1. Because each order has the effect of removing with finality an affirmative defense, it is appealable as of right under Rule 103.03(d), Rules of Civil Appellate Procedure. See, *Great* *N. Oil Co. v. St. Paul Fire & Marine Ins. Co.,* 291 Minn. 97 n. 1, 189 N.W.2d 404, 405 n. 1 (1971).

result of alleged negligent treatment by Hospitals' personnel. Plaintiff Stein (Nos. 49546 and 49566) sustained his injuries in August, 1974, while confined in an adult psychiatric ward in the Hospitals.[2] Plaintiff Alton (No. 49811) sustained her injury in November, 1973, while confined for a jejunoileo-bypass operation.[3] The merits of the plaintiffs' tort claims have not been litigated.

Pursuant to orders for bifurcated trials, the district court has decided only the issue whether the operation of the University Hospitals is a governmental activity and, therefore, immune from tort liability for any cause of action arising prior to August 1, 1976.[4] In both cases, the district court found the operation of the Hospitals to be a proprietary activity and, therefore, not immune.

The only issue raised in this appeal is whether the operation of the University of Minnesota Hospitals is a governmental activity, thereby entitling the Hospitals to immunity from tort liability for causes of action arising prior to August 1, 1976.

Under our decision in *Miller v. Chou*, 257 N.W.2d 277 (Minn.1977), the University of Minnesota Hospitals are entitled to immunity from tort liability in causes of action arising prior to August 1, 1976, unless it is determined that the operation of the Hospitals is a proprietary, rather than a governmental, activity. Cf., *Susla v. State*, 311 Minn. 166, 247 N.W.2d 907 (1976) (holding that sovereign immunity of State of Minnesota prior to August 1, 1976, did not extend to torts committed by the State in its proprietary capacity). Recently, in *Papenhausen v. Schoen*, 268 N.W.2d 565 (Minn.1978), which involved possible liability for pre-August 1, 1976, conduct, we were asked to determine whether operation of a state mental hospital was a proprietary or a gov-

ernmental function. In our opinion, we noted that the test generally used to make that determination

"* * * is whether the act is for the common good of all without the element of special corporate benefit *or* pecuniary profit. If it is, there is no liability; if it is not, there *may* be liability." 268 N.W.2d 569, quoting *Bolster v. City of Lawrence*, 225 Mass. 387, 390, 114 N.E. 722, 724 (1917).

We then discussed two previous cases involving the status of hospitals to identify the factors important in distinguishing between a proprietary and a governmental activity.

In the older of these two cases, *Borwege v. City of Owatonna*, 190 Minn. 394, 251 N.W. 915 (1933), we determined that the operation of a hospital by the city was proprietary, noting that the hospital was revenue-producing, that it did not knowingly admit or treat nonpaying patients, that the money received from payment for services was used only for hospital purposes, and that the charges for services rendered to charity patients were paid for by the county. The hospital was operated for the private advantage of the citizens of the city and was simply a substitute for a private hospital.

In the second case, *Gillies v. City of Minneapolis*, 66 F.Supp. 467 (D.Minn.1946), the Federal District Court of Minnesota held that the city's operation of Minneapolis General Hospital was a governmental activity. We noted in *Papenhausen v. Schoen* that the important factors in the *Gillies* determination were:

"(1) A primary function of the hospital was to provide free health care for the city's low-income residents;

"(2) The hospital in no sense competed with private hospitals, since no private

---

2. Plaintiff Stein has named as defendants the Regents of the University of Minnesota, University of Minnesota Hospitals, the Hospitals' administrator, physicians and other members of the Hospitals' staff.

3. Plaintiff Alton has named as defendants University of Minnesota Hospitals and John Doe.

4. August 1, 1976, is the effective date of this court's abrogation of the doctrine of governmental immunity as applied to the State of Minnesota in *Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975).

hospital would be willing to provide services without adequate compensation; and

"(3) Although some patients paid for the care they received, revenues collected from patients covered less than 10 percent of the hospital's annual operating costs." 268 N.W.2d 570.

We compared the state mental hospital to the hospitals in these two prior cases and determined that the state hospital was more like Minneapolis General Hospital. The specific function of the state mental hospitals is to provide care for the mentally ill; they do not compete with private hospitals; they will never be profit-making. *Papenhausen v. Schoen,* 268 N.W.2d 570.

■ As indicated by these prior cases, the factors important in determining whether operation of a hospital by state or local government is a proprietary or a governmental activity include the following: (1) whether the primary purpose or function of the hospital is to render services to patients who lack funds to obtain care at a private institution; (2) whether the operating revenues are derived from fees for services or from public funds; (3) whether the hospital is substantially similar to or competes with private institutions; (4) whether the hospital makes a profit. None of these factors is controlling, and each case is to be decided on its own facts.

Courts in at least three other states have faced this issue and have reached differing conclusions. A Georgia court of appeals addressed this issue peripherally in a decision upholding the doctrine of sovereign immunity as it related to the University of Georgia. The court concluded:

"6. The contention that the operation of a hospital in conjunction with the medical college is not a 'governmental function' is without merit. Public education is a governmental function and the Medical College of Georgia is an essential unit of this function. A medical college without a hospital in conjunction therewith would be like a buggy without a horse, or in more modern parlance, an airport without aircraft. Furthermore, 'This State has the sovereign right, as a State, to engage in any activity not prohibited by the State or national constitution. The determination of what governmental functions the State shall undertake with these sole limitations is made by the legislative department of the State government . . . The immunity thus enjoyed by the State is in no wise lifted because of the question involved.' *Roberts v. Barwick,* [187 Ga. 691, 697, 1 S.E.2d 713, 717 (1939)]." *Azizi v. Board of Regents of the University System,* 132 Ga.App. 384, 390, 208 S.E.2d 153, 158 (1974).

The Supreme Court of Ohio made the following observations about a hospital owned by the City of Cincinnati and connected with the University of Cincinnati:

"* * * The hospital was established in the 1920's by private grants and gifts made to the Board of Directors of the University of Cincinnati (a municipally owned institution of learning) for the teaching of medicine and nursing and for medical research. The hospital is operated by such board and is staffed by members of the faculty of the College of Medicine. All amounts received in payment of hospital bills are sent to the accounting office of the University of Cincinnati, and all expenses are paid by the university. A separate account is kept for the hospital. The hospital is self-supporting, the charges made to and paid by patients affording sufficient income for that purpose without the necessity of the contribution of public funds from any source. Only paying patients are admitted and treated, and no charity patients are accepted. All hospital rooms are either private rooms or semi-private rooms; there are no wards.

"The hospital provides facilities for the private practice of medicine by the faculty members of the College of Medicine, and only patients of such faculty members are admitted to the hospital. The physician-faculty members treating these patients make a charge for their services.

\* \* \* \* \* \*

"It seems to us that the evidence submitted in this case and the deductions which may be drawn therefrom are of such a character as to support the determination of both lower courts that Holmes Hospital is essentially a proprietary undertaking carried on under limited conditions, admissions thereto being largely confined to a selected class of paying patients. Contributions on its part to the preservation and advancement of the health and welfare of the community and its people generally are at least open to question. Consequently, the defense of governmental immunity may not be validly interposed by defendant to escape liability." *Hyde v. City of Lakewood*, 2 Ohio St.2d 155, 158, 207 N.E.2d 547, 550 (1965).

The district court, in the instant case, relied on the following reasoning of the Kansas Supreme Court in *Carroll v. Kittle*, 203 Kan. 841, 850, 457 P.2d 21, 28 (1969):

"We have no hesitancy in concluding that in the operation of the hospital at the University Medical Center the Board of Regents was engaged in a proprietary rather than a governmental function. The operation of a hospital is usually carried on by private individuals or private companies; private patients in the University hospital paid rates comparable to those which were charged in private hospitals; the hospital was receiving an annual income of approximately $6,000,-000.00 a year from private patients, and obtained 97 doctors for the medical school's faculty at a nominal salary of $3,600.00 a year because of the hospital facilities furnished them for their private patients.

"It is not necessary that an actual net profit result. [*Wendler v. City of Great Bend*, 181 Kan. 753, 316 P.2d 265 (1957)].

"We are forced to conclude that the rule of governmental immunity from liability for torts committed while engaged in proprietary functions is today without rational basis and hence there is no logical compulsion to extend it because there is a voluntary mingling of governmental and proprietary functions. Reason suggests that a patient who pays for professional services ought to be entitled to the same protection and the same redress for wrongs as if the negligence had occurred in a privately owned and operated hospital. If the government is to enter into businesses ordinarily reserved to the field of private enterprise, it should be held to the same responsibilities and liabilities.

\*     \*     \*     \*     \*     \*

"It will also be understood that we are not criticizing the Board of Regents for maintaining and operating the hospital. It is no doubt of great academic and financial benefit to the medical school. We are only holding that if it operates the hospital, receiving paying patients, it should be held to the same responsibility and liabilities as privately owned hospitals."

Although the facts of the instant case are not precisely the same as those of the cited cases, several of the concerns expressed (e. g. charging fees, supplementing faculty income) are presented here.

Appellants argue that the University of Minnesota Hospitals serve three functions: (1) they are used for education by the University's Medical School and other health science schools; (2) they are used for medical research; and (3) they render a "significant amount of charitable medical care to those unable to afford it elsewhere." There is little argument that the Hospitals are used for education and research, but there is some question whether they actually render "a significant amount of charitable medical care."

■ The legislation establishing the original University Hospital provided that it was to furnish "free care and treatment [to] indigent persons suffering from disease who have resided in the State of Minnesota for not less than six months." 1907 Laws, c. 80, § 3. Since that time, however, the operation of the University Hospitals has changed. Although Minn.St. 158.02[5] states

---

5.  Minn.St. 158.02 provides: "The University of Minnesota hospitals shall be primarily and principally designed for the care of legal residents of Minnesota who are afflicted with a

that the Hospitals are "primarily and principally designed" to render care to those who are financially unable to obtain it elsewhere, the majority of patients treated at the Hospitals do not, in fact, fall into that category.[6]

Figures submitted by appellants indicate that, from 1971 to 1977, the amount the Hospitals wrote off as uncollectible averaged approximately 2 percent of net patient service revenue. In comparison, North Memorial Medical Center [7] wrote off 1 percent. During that same period, the Hospitals' revenue from so-called "county paper" patients, whose hospital bills are paid by the county, averaged 4 percent of net patient service revenues and revenue from patients on welfare averaged 14 percent. In comparison, North Memorial serves an average of 10 percent welfare patients. It should be noted that all hospitals are paid by the appropriate governmental agency for services rendered to these patients. Further, there is no indication that any of these patients is charged less than other patients.[8] None of these patients is charged nominal fees; rather, each is charged standard fees based on the actual cost of the services.

Regarding the source of revenue, figures provided by appellants indicate that since 1955, the percentage of revenues received from the state, either directly or through the University, has been less than 20 percent and since 1971 has been about 11 percent. Thus, at least 80 percent of the operating revenues of the Hospitals has been derived from charges for services.[9] Although a substantial portion of that 80 percent is paid through governmental programs (federal, state, and local), the charges are paid. Private hospitals may also collect from these governmental programs for services rendered to eligible patients; thus, the University Hospitals do not differ from private hospitals in this respect.

The question whether the University Hospitals compete with private hospitals [10] can be answered by comparing prices, services, and purpose or function. The average price per day at University Hospitals is $300; the average price per day at a private hospital is $150 to $170. Appellants' explanation for this difference is that the patients at the University Hospitals have more complex problems, which require more, and more sophisticated and expen-

malady, deformity, or ailment of a nature which can probably be remedied by hospital service and treatment and who are unable, financially, to secure such care; or, in case of a minor, whose parent, guardian, trustee, or other person having lawful custody of his person, as the case may be, is unable financially to secure such care. The University of Minnesota hospitals are hereby designated as places of treatment for such persons.

"The hospitals shall be utilized for such instruction and for such scientific research as will promote the welfare of the patients committed to their care and assist in the application of science to the alleviation of human suffering."

6. Terms such as "welfare" and "indigent" were used rather loosely by counsel and witnesses in these cases to refer to those who qualify financially to have their charges paid by some governmental agency. Apparently they are not intended to refer to those one witness called "medically indigent"—those who qualify for Medicare because of their medical condition rather than their financial status.

7. North Memorial Medical Center is a private medical center located in Robbinsdale, Minnesota. Plaintiff Stein used this particular facility to represent an average private hospital. Appellants made no objection.

   Not all accounts are written off because the patient cannot pay. See, note 8, *infra*.

8. Some patients at the University Hospitals are charged lower fees or no fees. These include University employees, legislators, three out-patient clinics in Minneapolis, and obstetrics patients from Booth Hospital (home for unwed mothers). In some cases these fees are paid by government grants; in some cases, they are simply written off.

9. In *Gillies v. City of Minneapolis*, 66 F.Supp. 467 (D.Minn.1946), revenue from charges to patients was less than 10 percent of total operating cost. Thus, over 90 percent was paid out of tax money.

10. The terms "local," "community," "private" were all used somewhat interchangeably by counsel and witnesses. All apparently refer to the typical "full-service" hospital.

sive, tests.[11] Appellants also claim that because University Hospitals primarily treat so-called "tertiary" patients, those who cannot be treated in a doctor's office or at the standard private hospital, the Hospitals are not competing with private hospitals. It was further stated that whereas the primary mission of the University Hospitals is education and research, the mission of the private hospital is to serve patients.

To the extent that the University Hospitals offer treatment that other hospitals do not, there is no direct competition between them. But that fact alone does not control the determination whether operation of the University Hospitals is a proprietary or a governmental activity. Medical education and research are not activities uniquely governmental.[12] Private hospitals also engage in medical education and research. The record indicates that a significant number of students at the University Medical School obtain part of their clinical experience at other hospitals, both in the Twin Cities metropolitan area and in rural Minnesota. There is also evidence that other hospitals, such as North Memorial Medical Center, are involved in medical research and continuing medical education. Thus, although the University Hospitals are used for purposes of medical education and research, that does not sufficiently distinguish them from private hospitals for purposes of immunity.

The Hospitals are not a profit-making enterprise. In fact, operating expenses have exceeded operating revenues by an average of 10 percent per year for fiscal years 1974–1977. This deficiency is apparently made up, at least in part, by state appropriations. The fact that University Hospitals are neither profit-making nor totally self-supporting does not, however, mean that their operation is a governmental activity. Because they are 90 percent self-supporting, the state is able to save money on the operation of the medical school. Thus, the operation of the Hospitals specially benefits the medical school (and other health science schools). The Hospitals provide a benefit to the medical school in that the patients are "participants" in the educational and research activities, yet these patients pay full fees for the services they receive—either personally or through private insurance or governmental funding. Thus, the medical school and other health science schools—both students and faculty—are being specially benefited by the operation of the University Hospitals.

Further, faculty members of the medical school are able to augment their incomes through charges made for services rendered to patients at the Hospitals. If this practice were not allowed, these faculty members might leave for other, better-paying positions.[13] This use of the Hospitals clearly results in a special benefit to the medical school and cannot be considered a governmental function.

Although it is not seriously disputed that the University of Minnesota Medical School is a leader in the field of medicine and that the Hospitals aid in the research and development of faculty and students and benefit individual patients, we are compelled to hold that, on the basis of the facts, factors, tests, and precedent set forth above, the

---

11. The financial analyst from North Memorial Medical Center testified that charges on individual supplies and procedures were similar.

12. Cf. *Parker v. City of Highland Park*, 404 Mich. 183, 194, 273 N.W.2d 413, 416 (1978) ("The operation of a hospital is not an activity of a peculiar nature such that the activity can only be done by government.")

13. Without the Hospitals, it would be more difficult for the faculty members to augment their incomes through fees from a private practice. With the Hospitals, the medical school is able to attract and retain high-quality faculty members despite low legislative appropriations for salaries.

The only doctors permitted to practice in the Hospitals are members of the University Medical School faculty. Compensation for the faculty of the medical school is not limited to their salaries as professors in the University system. Rather, members of the medical faculty are allowed to supplement their salaries as professors with fees charged to private patients. They may receive fees at least equal to their basic salary.

Hospitals are not entitled to immunity in these cases. Although the Hospitals still have some indigent patients, the record shows that the number of indigent patients does not exceed that of other hospitals in the area. Although part of the function of the Hospitals remains governmental, the largest use being made thereof is proprietary. We believe the facts of this case bring it within our decision in *Borwege v. City of Owatonna, supra.* With all of the expertise available to the University, the managers of the University Hospitals must be charged with the knowledge that the function of the Hospitals was changing over the years from purely governmental to at least partially proprietary.

The doctrine of governmental immunity is a vestige of the ancient privilege and divine right of kings and has been gradually and steadily eroded over the past several decades. Since our decision in *Nieting* abolishing all remaining governmental immunity, there has been no question of the University's exposure to suit. The University may still assert all of its common law defenses, including lack of negligence.

The trial court's decision in each case is affirmed.

OTIS and TODD, JJ., took no part in the consideration or decision of this case.