512 F.Supp. 889 (1981)
In re HOLOHOLO
Barbara K. TRENS, individually and as personal representative of Mike Julio Trens, deceased, Plaintiff,
v.
The UNIVERSITY OF HAWAII, a corporation; the Research Corporation of the University of Hawaii, a corporation; State of Hawaii, a sovereign corporation; the University of California, a corporation; John Laney; and Arthur F. Stubenberg, Defendants.
Robert RUSECKAS, personal representative of the estate of James Edward Ruseckas, deceased, Plaintiff,
v.
The UNIVERSITY OF HAWAII, a corporation; the Research Corporation of the University of Hawaii, a corporation; State of Hawaii, a sovereign corporation; the University of California, a corporation; John Laney; and Arthur D. Stubenberg, as personal representative of the estate of Arthur F. Stubenberg, Defendants.
Lynne Ann HAROUN, individually and as executrix of the estate of Stephan Randall Shannon, deceased, and Joann D. Shannon, Plaintiffs,
v.
The UNIVERSITY OF HAWAII, a corporation; the Research Corporation of the University of Hawaii, a corporation; State of Hawaii, a sovereign state; the University of California, a corporation; Michael Vincent Paulin, as guardian of the property of John Laney, Sr., deceased; and Arthur D. Stubenberg, as personal representative of the estate of Arthur F. Stubenberg, deceased, Defendants.
Youngsook Kim HARVEY, individually and as personal representative of the estate of Robert R. Harvey, deceased; Andrew Kim Weaver; Sarah Kim Weaver; and Susan W. Niemeyer, individually *890 and as personal representative of the estate of Gary C. Niemeyer, deceased, Plaintiffs,
v.
UNIVERSITY OF HAWAII, a corporation; Research Corporation of the University of Hawaii, a corporation; State of Hawaii, a sovereign state; University of California, a corporation; Michael Vincent Paulin, as guardian of the property of John Laney, Sr., deceased, and a legal representative of the estate of John Laney, Sr., deceased; Arthur D. Stubenberg, as personal representative of the estate of Arthur F. Stubenberg, deceased; and Barbara K. Trens, as personal representative of the estate of Mike Julio Trens, deceased, Defendants.
Nancy J. LAIRD, individually, as personal representative of Norman P. Laird, deceased, and as guardian ad litem for Kristine Renee Laird, a minor, Plaintiffs,
v.
The UNIVERSITY OF HAWAII, a corporation; the Research Corporation of the University of Hawaii, a corporation; the University of California, a corporation; Michael Vincent Paulin, as guardian of the property of John Laney, Sr., deceased; Arthur D. Stubenberg, as personal representative of the estate of Arthur F. Stubenberg, deceased, Defendants.
Carol A. CHARNELL, individually, as personal representative of Robert Lewis Charnell, deceased, and as guardian ad litem for Mareline Charnell and Erika Charnell, minors, Plaintiffs,
v.
The UNIVERSITY OF HAWAII, a corporation; the Research Corporation of the University of Hawaii, a corporation; State of Hawaii, a sovereign corporation; the University of California, a corporation; Michael Vincent Paulin, as guardian of the property of John Laney, Sr., deceased; Arthur D. Stubenberg, as personal representative of the estate of Arthur F. Stubenberg, deceased, Defendants.
Civ. Nos. 79-0324A, 79-0324, 79-0353, 79-0583, 79-0631, 80-0053 and 80-0054.
United States District Court, D. Hawaii.
April 13, 1981.
*891 Carlton E. Russell, Long Beach, Cal., David C. McClung, Honolulu, Hawaii, for plaintiff in No. 79-0324.
Stuart M. Cowan, Robert E. Rau, Cowan & Frey, Honolulu, Hawaii, for plaintiff in No. 79-0353.
John S. Edmunds, Charles W. Crumpton, Edmunds & Hall, Honolulu, Hawaii, for plaintiffs in Nos. 79-0583, 80-0053 and 80-0054.
David C. Schutter, Reinhard Mohr, Honolulu, Hawaii, for plaintiffs in No. 79-0631.
Douglas Hartwich, Short & Cressman, Seattle, Wash., for plaintiffs in Nos. 80-0053 and 80-0054.
Charles E. Yates, Moriarty, Mikkelborg, Broz, Wells & Fryer, Seattle, Wash., for plaintiffs in No. 80-0053.
Wayne Minami, Atty. Gen., Nelson S. W. Chang, Deputy Atty. Gen., Honolulu, Hawaii, for defendants the State of Hawaii and the University of Hawaii.
*892 Everett Cuskaden, Oliver, Cuskaden & Lee, Honolulu, Hawaii, for defendant the Research Corp. of the University of Hawaii.
Richard K. Quinn, Stephen A. Nordyke, Michael M. Payne, Honolulu, Hawaii, for defendant The Regents of the University of California.
John A. Roney, Stubenberg, Roney, Hartnett, Lawhn, Fong & Kuwasaki, Honolulu, Hawaii, for defendant Stubenberg.

DECISION AND ORDER DENYING MOTIONS TO DISMISS
SAMUEL P. KING, Chief Judge.

I. Facts
On December 9, 1978, the M/V HOLOHOLO, a 90-foot Alaskan power scow converted to a yacht and then to a research vessel, sailed from Honolulu, Hawaii, on the second of six planned voyages to an ocean thermal energy conversion ("OTEC") station located 17 nautical miles west of Kawaihae on the Island of Hawaii. The vessel had been chartered by the Research Corporation of the University of Hawaii ("RCUH") pursuant to a subcontract with the University of Hawaii ("UH"), which was in turn operating under a subcontract with defendant The Regents of the University of California ("UC"), which was operating pursuant to a master contract with the United States Department of Energy ("DOE").[1] Aboard were the owner, a licensed master of research vessels, a mechanic, and seven marine scientists for a total of ten persons.
The HOLOHOLO did not arrive at Kawaihae on schedule on December 11. A ten-day search for the vessel began on December 12 following notification to the United States Coast Guard on that day. During that search, no trace of the vessel or those aboard was found.[2]
Plaintiffs brought these wrongful death actions on behalf of themselves and the estates of the presumably deceased persons on the vessel. The actions allege negligent, willful, intentional, or reckless acts or omissions by defendants, their agents, or employees in the design, construction, supervision, control, management, maintenance, alteration, outfitting, entrustment, and operation of the HOLOHOLO. Specifically, plaintiffs allege, among other things, that defendants: (1) intentionally disregarded and violated laws, safety regulations, and established procedures intended to safeguard lives and property at sea; (2) used the HOLOHOLO for ocean operations it was unsafe to perform by reason of its design, hull strength, water tight integrity, and configuration; (3) altered the HOLOHOLO to render it more unsafe and unseaworthy; (4) failed to maintain adequate communications; (5) failed to furnish the vessel with an adequate crew; (6) failed to equip the vessel with adequate lifesaving equipment; and (7) failed promptly to notify the United States Coast Guard so that effective search and rescue could be made. All of these acts or omissions, plaintiffs allege, resulted in requiring their decedents *893 to perform their duties in an unsafe place to work.

II. Causes of Action and Jurisdiction
Plaintiffs allege that the sinking and presumed deaths occurred either on the navigable waters of the United States, possibly within the waters of the State of Hawaii, or on the high seas of the North Pacific Ocean. The various actions, now consolidated, were brought under the admiralty and maritime jurisdiction of this Court pursuant to the Jones Act, 46 U.S.C. § 688 (1975), the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 761-767 (1975), and the General Maritime Law. Jurisdiction lies under 46 U.S.C. § 761 and/or 46 U.S.C. § 688 and the general admiralty and maritime jurisdiction.
The Jones Act provides:
Recovery for injury to or death of seaman
Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
46 U.S.C. § 688.
The DOHSA provides:
Right of action; where and by whom brought
Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.
46 U.S.C. § 761.
Plaintiffs seek damages amounting to several millions of dollars under one or both of the statutes or under the general maritime cause of action.
The availability of damages under the Jones Act depends upon whether each of the deceased was a seaman. Since that issue will be determined by the factfinder at the trial, it is treated here in favor of the coverage of the deceased as non-moving parties on motions to dismiss. As to the DOHSA, all indications at this point are that the sinking and deaths occurred on the high seas, i. e., more than one marine league from shore.[3] The deceased are "persons" covered by the DOHSA.

III. The Eleventh Amendment
The consolidated actions are before this Court on motions to dismiss made by defendants the State of Hawaii, the UH, the RCUH and the UC on the ground that the actions are barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.[4]
*894 As stated by the United States Supreme Court in Edelman v. Jordan, 415 U.S. 651, 653, 94 S.Ct. 1347, 1351, 39 L.Ed.2d 662 (1974):
... the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.
See also Spicer v. Hilton, 618 F.2d 232, 236 (3d Cir. 1980)

A. State Defendants
To determine whether these wrongful death actions for damages are barred by the Eleventh Amendment as against the state defendants, three questions must be addressed. These are: (1) Are the "state defendants" states or alter-egos of states for purposes of the Eleventh Amendment?; (2) Does the Eleventh Amendment apply to these wrongful death actions created by federal statute under the admiralty and maritime power?; and (3) Have the state defendants waived any Eleventh Amendment immunity? See Jackson Sawmill Co. v. United States, 580 F.2d 302, 308 (8th Cir. 1978).
The threshold question is whether each of the "state defendants" is a state or state entity for purposes of the Eleventh Amendment. The State of Hawaii, a named defendant, clearly is a state for purposes of the amendment. The UH and the RCUH both claim to be state entities entitled to the protections of the amendment.
The UH exists under the authority of Art. IX, §§ 4 and 5 of the Hawaii Constitution and of Chapter 304 of the Hawaii Revised Statutes. Article IX, § 4 of the Constitution and section 304-2 of Hawaii Rev. Stat. provide that the university is established as a state university and constitutes a body corporate. Even more important in the determination of the status of the UH is section 304-6 which provides:
The university may sue and be sued in its corporate name; however, it shall be subject to suit only in the manner provided for suits against the State, and any liability incurred by the university in such a suit shall be the liability of the State.
Therefore, by state statute, any recovery awarded against the UH, absent insurance coverage or other indemnification, would come from the state treasury.
Though other factors have been examined to determine whether a state entity is entitled to the protections of the Eleventh Amendment,[5] the most important is whether the state treasury ultimately would be liable, Jagnandan v. Giles, 538 F.2d 1166 (5th Cir. 1976), cert. denied, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977). Since section 304-6 specifically provides for payment by the state, the UH is the state for purposes of the Eleventh Amendment. None of the other relevant factors indicates otherwise. See Anthony v. Cleveland, 355 F.Supp. 789, 790 (D.Hawaii 1973); Waugh v. The University of Hawaii, 621 P.2d 957 at 965 (Hawaii 1980).
The RCUH was established under chapter 307 of the Hawaii Rev.Stat. as a body corporate. The chapter provides that the RCUH "shall be a public instrumentality and shall be a part of the University of Hawaii for administrative purposes, as provided for in section 26-35." Hawaii Rev. Stat. § 307-1 (1976). This provision and others in chapter 307 evidence an apparent legislative intent to establish the RCUH as an arm of the UH. The chapter provides certain other characteristics of the RCUH that indicate its role as part of the UH, such as its function of promoting educational, scientific and literary pursuits, Hawaii *895 Rev.Stat. § 307-1; the appointment by the governor of some of the members of its board of directors, Hawaii Rev.Stat. § 307-2; the subjecting of it in its activities to decisions of the President of the UH, Hawaii Rev.Stat. § 26-35; the structuring of at least part of its budgetary and financial reporting process the same as that of the UH, Hawaii Rev.Stat. § 307-6; and in the event of dissolution of the RCUH, the vesting of its property in the UH, Hawaii Rev. Stat. § 307-7.
On the other hand, some characteristics of the RCUH indicate that it functions to some extent independently of the state. For example, the RCUH has the power to sue and be sued in its own name, Hawaii Rev.Stat. § 307-3(6), and is excepted from certain state laws applicable to other agencies. Under section 307-4, the RCUH is excepted from requirements relating to special fund reimbursements to the state general fund, to advertising for bids and purchases, to civil service, to compensation, and to public employment. Also, its specific function of promoting cooperative research with private firms and persons and attracting funds to promote its objectives, with the power to establish a special account for depositing funds received from contracts, grants, awards, and gifts suggest that the RCUH functions somewhat as an independent entity carrying out a proprietary function.
Though the exact status of the RCUH is not clear at this time and the determination of its status is difficult to discern based on the information before this Court, the statutory scheme for the establishment and functioning of the RCUH convinces this Court that, for purposes of these motions to dismiss, the RCUH is the state and is entitled to raise the Eleventh Amendment as a bar to these actions. However, as the answer to the key question of ultimate liability of the state treasury for any liability of the RCUH is not clear now and discovery may reveal information about the RCUH that could affect this conclusion, the issue may be reopened after discovery has been completed.
The fourth state defendant, The Regents of the University of California ("UC"),[6] also has moved for dismissal on Eleventh Amendment grounds. The state law cited by the UC clearly establishes that the UC is a branch of state government established under Art. 9, § 9 of the California Constitution. See Ishimatsu v. Regents of the Univ. of Calif., 266 Cal.App.2d 854, 862-864, 72 Cal.Rptr. 756 (1968); Regents of the Univ. of Calif. v. City of Santa Monica, 77 Cal. App.3d 130, 135, 143 Cal.Rptr. 276 (1978). In addition, the United States Supreme Court has recognized the UC as a "constitutional department or function of the state government." Hamilton v. Regents of the Univ. of Calif., 293 U.S. 245, 257, 55 S.Ct. 197, 201, 79 L.Ed. 343 (1934). Also, since the UC depends upon appropriations by the California Legislature, any damages awarded against the UC would, absent insurance or other indemnification, come from the state treasury. See California State Employees Ass'n v. Flournoy, 32 Cal.App.3d 219, 232-233, 108 Cal.Rptr. 251 (1973); California State Employees Ass'n v. State of California, 32 Cal.App.3d 103, 110-111, 108 Cal.Rptr. 60 (1973). Therefore, the UC is the state for purposes of the Eleventh Amendment.

B. Waiver by consent
It long has been established that a state may consent to suit against it in federal court by effecting a waiver of its Eleventh Amendment immunity. Parden v. Terminal Railway Co., 377 U.S. 184, 186, 84 S.Ct. 1207, 1209, 12 L.Ed.2d 233 (1964); Petty v. Tennessee-Missouri Comm'n, 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959); Ford Motor Co. v. Dept. of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); Great N. Life Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). Such consent has been found to have occurred *896 by statute, Ford Motor Co., supra 323 U.S. at 468-470, 65 S.Ct. at 352-353, through a state charter provision, Parden, supra; and through Congressional action taken pursuant to a federal power (constructive waiver), Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); Cantwell v. County of San Mateo, 631 F.2d 631 (9th Cir. 1980); Peel v. Florida Dept. of Transportation, 600 F.2d 1070 (5th Cir. 1979); Jennings v. Illinois Office of Educ., 589 F.2d 935 (7th Cir. 1979).
This Court concludes that, as to these wrongful death actions, the Hawaii state defendants have effected express waivers by statute and, along with the UC, have effected waivers through the implied terms of a contract and a subcontract and by constructive waivers.

1. Express Waiver by Statute

a. State of Hawaii
Plaintiffs claim that the State of Hawaii (including the UH and the RCUH) has expressly consented by statute to suit in federal court and has thereby waived its immunity under the Eleventh Amendment. This claim is based on two statutory provisions, Hawaii Rev.Stat. §§ 662-2 and 661-11 (1976). Section 662-2 provides:
The State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
The Supreme Court of Hawaii has held that this statute is a specific waiver of tort immunity. Figueroa v. State, 61 Hawaii 369, 393, 604 P.2d 1198 (1979). The statute expressly waives all tort immunity, not by specific causes of action, and indicates that the State of Hawaii is to be treated like a private individual. This statute is broad enough to include a waiver of Eleventh Amendment immunity as to tort actions against the state.[7] The same conclusion has been reached as to a waiver of immunity provision in a similar Florida statute, Kiesel v. State of Florida, Dept. of Natural Resources, 479 F.2d 1261 (5th Cir. 1973), and a similar Texas statute, Mifsud v. Palisades Geophysical Institute, Inc., 484 F.Supp. 159 (S.D.Texas 1980). Both statutes indicate that the state is to be treated like a private individual.
The Hawaii state defendants argue that section 662-2 does not constitute consent in that the waiver applies only to suits in the state's own courts. Their argument is based on Hawaii Rev.Stat. § 662-3 (Supp. 1980), which provides:
The circuit courts of the State and, except where otherwise provided by statute or rule, the district courts shall have original jurisdiction of all tort actions on claims against the State, for money damages, accruing on and after July 1, 1957 for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the State while acting within the scope of his office or employment.
This provision was amended in 1978 to add the reference to district courts and to substitute "original jurisdiction" for "exclusive jurisdiction." Two parts of the amended statute convince this Court that the waiver of tort immunity in section 662-2 is not just a waiver as to actions in state courts. One is the change from exclusive to original jurisdiction  a change that reflects an intent *897 to broaden the jurisdiction for tort claims against the state. The second is the insertion of the phrase "except as otherwise provided by statute or rule." As will be discussed later, the DOHSA provides for exclusive jurisdiction in the United States district courts, which means that actions brought under the DOHSA cannot be brought in the Hawaii state courts.
United States Supreme Court and other decisions have established that a state may waive immunity only as to actions in its own courts. Kennecott Copper Corp. v. Tax Commission, 327 U.S. 573, 577, 66 S.Ct. 745, 747, 90 L.Ed. 862 (1946); Riggle v. State of California, 577 F.2d 579, 585 (9th Cir. 1978). However, these Hawaii statutes establish waivers of immunity as to all courts "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction...." Edelman v. Jordan, supra 415 U.S. at 673, 94 S.Ct. at 1360. This holding applies to all the Hawaii state defendants.[8]
Section 661-11 of Hawaii Rev.Stat. provides a waiver of immunity for tort claims against the state where the state is covered by insurance. It provides:
This section applies to an action where (1) the State is a party defendant; (2) the subject matter of the claim is covered by an insurance policy entered into by the State or any of its agencies; and (3) chapter 662 does not apply. No defense of sovereign immunity shall be raised in an action under this section. However, the State's liability under this section shall not exceed the amount of, and shall be defrayed by, such insurance policy.
An action under this section is not subject to the provisions of sections 661-1 to 661-10.
The section constitutes express consent to all claims covered by insurance.[9] The Hawaii state defendants, as revealed in discovery and in their memoranda, are covered by insurance.[10] Whether chapter 662, as discussed earlier, applies to this action is not completely clear at this time. Though wrongful death is an actionable tort under *898 Hawaii law, Hawaii Rev.Stat. §§ 663-3, 663-4 (1976), it is possible that development of plaintiffs' cases could reveal that the negligent or other kinds of acts alleged will fall under one exception to the provisions in chapter 662 and render section 661-11 inapplicable. That exception, under section 662-15(1), is:
Any claim based upon an act or omission of an employee of the State, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation is valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved has been abused.[11]
Section 661-1 provides, as to actions under chapter 661, for original, though not exclusive, jurisdiction in the circuit courts of the state. However, section 661-11 specifically provides that actions brought under it are not subject to section 661-1. Therefore, no defense of sovereign immunity, including the Eleventh Amendment, can be raised as to actions under chapter 661 if it is later determined that chapter 662 does not apply and the applicable statutory consent is section 661-11. The state defendants claim that the limitation on the amount of recovery to the amount of insurance coverage somehow negates the consent. This argument is rejected since the provision relates only to the amount of recovery and not to the presence or absence of consent.

b. The Regents of the University of California
None of the plaintiffs has raised consent by statute by the UC. However, because the Eleventh Amendment issue is one the Court may be required to raise and examine itself, Palila v. Hawaii Dept. of Land and Natural Resources, 471 F.Supp. 985, 995 (D.Hawaii 1979), aff'd, 639 F.2d 495 (9th Cir. 1981), possible waiver statutes were examined. In previous cases, parties have raised two general provisions of California law as possible waivers of the state's Eleventh Amendment immunity. These are:
Suits may be brought against the state in such manner and in such courts as shall be directed by law.
Art. 3, § 5 of the California Constitution (Supp.1981), and
A public entity may sue and be sued. West's Calif. Gov't Code § 945 (1980). "Public entity" is defined to include the state. West's Calif. Gov't Code § 811.2 (1980).
Neither of these provisions satisfies the requirement for express language or such overwhelming implications from the text necessary to establish a waiver of Eleventh Amendment immunity but instead establish only the fact of suability. Yuan Jen Cuk v. Lackner, 448 F.Supp. 4, 8 (N.D.Cal.1977) (three-judge court); Safeco Ins. Co. of America v. Guyton, 443 F.Supp. 10 (C.D.Cal. 1978).
A similar "power to sue and be sued" provision is part of the constitutional section establishing the University of California. Art. 9, § 9. There is no reason to interpret this provision any differently from section 945, supra. Compare Soni v. Board of Trustees of University of Tennessee, 513 F.2d 347 (6th Cir. 1975), cert. denied, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976) with Martin v. University of Louisville, 541 F.2d 1171 (6th Cir. 1976); See also Pharmacists Soc. of Milwaukee County Inc. v. Dept. of Health and Social Services, 79 F.R.D. 405 (D.Wis.1978). This Court concludes that California has not by *899 statute consented to suit against it in federal court.

2. Implied Consent by Contract
The state defendants all are bound to some extent by the terms of the master contract between the UC and the United States and the subcontract between the UC and the UH and the RCUH. The master contract is very long and complex and has undergone several modifications in the years it has been in effect between the United States and the UC. Article XIV of the master contract provides the terms for "Contingencies  Litigation and Claims." The five parts of this article establish a consent to suit in federal court and therefore a waiver of Eleventh Amendment immunity by "such overwhelming implications from the text [of the contract] as [will] leave no room for any other reasonable construction." See Edelman, supra.
Article XIV begins in part one by deeming the work to be done as essential to the common defense and security of the United States and recognizing that the work "involves unusual, unpredictable and abnormal risks."
Part two provides, in summary, that absent bad faith or willful misconduct by an officer of the university (UC) or the Laboratory Director, the United States is liable and:
shall indemnify and hold the University harmless against any delay, failure, loss or damage (including personal injuries and deaths of persons and damage to property) and any expenses in connection therewith (including expenses of litigation) arising out of or connected with the work, including any loss or damage and incidental expense for any alleged liability for patent infringement or any alleged liability of any kind, and for any cause whatsoever arising out of or connected with the work....
Part three of the article provides:
Except as otherwise provided herein, the University shall initiate, where it may legally do so, or defend litigation and claims in connection with this contract and may settle such litigations or claims with the prior approval of the Contracting Officer.[12]
Part four of the article provides:
The Government shall pay directly and discharge completely all final judgments, including assessed costs and all expenses of litigation, including attorney fees, entered against the University and, when requested by the University, all claims which may be settled by agreement and approved by the Contracting Officer.
These first four parts of article XIV[13] evidence an understanding between the parties that the work was to be done under the supervision and control of the United States Government. The government is bound to indemnify the UC, and possibly the UH and RCUH, for any liability incurred in litigation arising from the contract work.[14] In addition, part two contemplates possible litigation against the UC for patent infringement that might occur in the course of the work. Under 28 U.S.C. § 1338 (1976), the *900 federal district courts have original and exclusive jurisdiction of all civil actions for patent infringement.[15] The inclusion of specific references to potential patent liability and to other areas of federal jurisdiction, when read with the whole of article XIV, establishes implied consent by at least the UC to suit in federal court "by such overwhelming implications from the text as [will] leave no room for any other reasonable construction...."
The Hawaii state defendants argue that any agreements that the United States would indemnify the UC or that the UC would be required to defend against suits arising out of the work under the master contract do not apply to them. They base this contention on the terms of the subcontract, specifically on one paragraph in the introduction and on ARTICLE X-LIABILITY. The introductory paragraph cited provides:
In accepting this Subcontract, the Subcontractor agrees to perform the Subcontract work in accordance with the following terms and conditions. No other terms or conditions shall be binding upon the parties unless accepted by them in writing. The parties hereby accept, incorporate into, and make part of this Subcontract APPENDIX A-REIMBURSEMENT OF COSTS and APPENDIX B-SCOPE OF WORK.[16]
Article X, as cited by the State of Hawaii and the UH, provides:
In the conduct of work under this Subcontract, the Subcontractor is acting in the capacity of an independent contractor; and neither party shall by reason of this Subcontract be obligated to defend, assume the cost of defense, hold harmless or indemnify the other from any liability to third parties for loss of or damage to property, death, or bodily injury, arising out of or connected with the work under this Subcontract, ....
However, the provision continues:
... except as provided in ARTICLE XXXI-PATENTS [sic. should read XXX-PATENTS], ARTICLE XXIII  LITIGATION AND CLAIMS, and ARTICLE XXIV-TAXES.
Even though the introductory paragraph and article X indicate that the subcontractors (the UH and the RCUH) may not be indemnified by the United States or the UC to the same extent that the UC is indemnified by the United States under the master contract, the complete picture still indicates that the subcontractors entered the agreement with consent to suit in federal court. A specific example of a provision in the subcontract indicative of this consent is ARTICLE XXX-PATENTS, which provides that the subcontractor (the UH and the RCUH) has authorization to use patents held by the United States and might be liable for patent infringement. The significance of this already has been discussed. Also, under ARTICLE XXIII-LITIGATION AND CLAIMS, the UC may require the UH to initiate litigation and the UH must give the UC immediate notice of any claims against the UH arising out of the performance of the subcontract. The complete text of ARTICLE XXIII, PART B,[17] *901 evidences an intimate involvement of the UC (which is indemnified by the United States for claims for which it is ultimately liable), and of the United States, with any claims against or brought by the UH. For example, the article provides that any amounts incurred by the UH because of defense of an action as to a claim not covered by insurance are allowable items of costs to the UC unless the claim would have been compensated by insurance that the UH was required by law or written direction of the UC to carry but which the UH failed to procure through its own fault or negligence.
Provisions of the contract and subcontract establish that the UC and the UH must have understood that the agreements contemplated possible suits against them in federal court and both of them then voluntarily entered the contracts and proceeded to carry out the work. This alone establishes consent.
However, the complete picture is even more convincing. The state defendants sought, on a competitive basis, to enter contracts to conduct research, on a paid basis, in the interest of and on behalf of the United States. The contracts contain numerous examples of involvement of the United States in the conduct of the research by the UC and the UH. In many instances, this amounts to complete control by the United States and/or the UC over certain aspects of the performance of the contracts by the UC and/or the UH. It is difficult, if not impossible, to imagine that the UC and the UH did not understand that subjecting themselves to, among others, suits for patent infringement as a named or real party in interest through the use of patents held by the United States, to suits brought by the United States for non-performance or other breach of the contracts,[18] and to suits by third parties[19] where the United States *902 may be liable for all or part of a judgment would subject them to suit in federal court. Based on the overwhelming implications of the language of the contracts, this Court holds that the UC, the UH and the RCUH consented to suit in federal court.[20]

3. Constructive Waiver
The doctrine of constructive waiver, as established by the United States Supreme Court in a line of cases, see citations under waiver by consent, supra, requires, in its simplest terms, three steps to be met. Those are: (1) Congress must have the power to abrogate state Eleventh Amendment immunity in its exercise of powers granted to it under the Constitution of the United States, and (2) Congress must have manifested its intent to abrogate that immunity, and (3) the state must be considered to have consented to be sued by entering into the relevant federally regulated area. As this Court has stated previously:
Then, too, the Eleventh Amendment will not bar an action against the state itself where Congress has clearly manifested its intent to abrogate constitutional immunity and the state has impliedly consented to be sued.... Congress has the authority to abrogate state immunity in the exercise of the powers granted to it under the Constitution.... The "threshold fact of Congressional authorization" is found where a Congressional enactment "by its terms authorize[s] suit by designated plaintiffs against a general class of defendants which literally include[s] States or state instrumentalities." .... Where the statute is silent, Congressional authorization can also be found where the statute's legislative history focuses "directly on the question of state liability," ... or where the statute would be rendered meaningless with respect to states if liability were not imposed. (citations omitted)
Palila v. Hawaii Dept. of Land and Natural Resources, supra, at 996-997. See also Peel v. Florida Dept. of Transportation, supra.
Constructive waiver has been found in two overlapping situations: (1) where Congress has acted under a legitimate regulatory power, such as commerce, admiralty or maritime, and the state has entered into the federally regulated area, and (2) where Congress has created private causes of action in an area of its regulation and the state becomes involved in that area. In this case, two of the causes of action are created by Congress  the Jones Act and the DOHSA  and are within the legitimate regulatory power of Congress, and the other  general maritime law  provides a cause of action for wrongful death based on unseaworthiness in situations not covered by the DOHSA or the Jones Act, Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). These cases were brought under these causes of action in admiralty or maritime, areas reserved to the federal government and within the exclusive jurisdiction of the United States district courts.[21]

a. The Jones Act
The Jones Act, 46 U.S.C. § 688, extends to seamen the remedies made available to railroad workers under the Federal *903 Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq. (1972). Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 546-547, 80 S.Ct. 926, 930-931, 4 L.Ed.2d 941 (1960); Public Adm'r of Cty. of N. Y., Etc. v. Angela Compania, Etc., 592 F.2d 58, 61 (2d Cir. 1979), cert. dismissed, 443 U.S. 928, 100 S.Ct. 15, 61 L.Ed.2d 897 (1979); Huckins v. Board of Regents of University of Michigan, 263 F.Supp. 622, 623 (E.D.Mich.1967); Cocherl v. State of Alaska, 246 F.Supp. 328, 330 (D.Alaska 1965). As the United States Supreme Court has stated:
The Jones Act gives a remedy to the dependents of seamen killed in the course of employment by his employer's negligence, no matter where the wrong takes place.
Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 621 n.11, 98 S.Ct. 2010, 2012 n.11, 56 L.Ed.2d 581 (1978).
In Parden v. Terminal Railway Co., supra, the United States Supreme Court held "that the State had fully subjected itself to the federal commerce power, as exercised through the FELA, by owning and operating an interstate railroad." Palila v. State of Hawaii, supra at 998. The reasoning of Parden is directly applicable to the Jones Act because of the incorporation of the principles and remedies of FELA into the Jones Act. While recent Supreme Court cases may have narrowed the application of the doctrine of constructive waiver[22] and narrowed the Court's interpretation of Congress' power under the Commerce Clause,[23] the breadth of the admiralty and maritime powers of Congress[24] and the intent to abrogate manifested in the Jones Act and the DOHSA, see Mitchell v. Trawler, supra; Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), establish constructive waivers in this case.
The empowering of Congress, through the Constitution, in the admiralty and maritime area, was all encompassing:
The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law and empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction. Moreover, it took from the States all power, by legislation or judicial decision, to contravene the essential purposes of, or to work material injury to, characteristic features of such law or to interfere with its proper harmony and uniformity in its international and interstate relations. To preserve adequate harmony and appropriate uniform rules relating to maritime matters and bring them within control of the Federal Government was the fundamental purpose; and to such definite end Congress was empowered to legislate within that sphere.
Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 160, 40 S.Ct. 438, 440, 64 L.Ed. 834 (1920). In acting to create causes of action for maritime torts, the Congress is exercising *904 its federal power to control the admiralty and maritime area in "its substantive as well as its procedural features...." Panama R.R. Co. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748 (1924), cited in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953). This power, perhaps broader than the commerce power, see note 23, supra, encompasses the power to abrogate state Eleventh Amendment immunity.
There can be little question that, in undertaking a proprietary venture onto the navigable waters of the United States and the high seas, the state defendants knew they were operating in a sphere of exclusive federal regulation. Congress had acted to provide rights and remedies to seamen injured or killed while on a vessel. The state defendants impliedly consented to be sued in federal court under the Jones Act by voluntarily entering this sphere of federal regulation.
This is not a case where the states simply accepted benefits available to them as a matter of right if certain conditions were met. See Edelman, supra; Florida Dept. of Health v. Florida Nursing Home Association, ___ U.S. ___, 101 S.Ct. 1032, 67 L.Ed.2d 132 [1981]. But rather this is a case of two states seeking to conduct federal research on a paid basis the right to which each sought on a competitive basis. In the process of conducting the research, the state defendants were required to operate a vessel on the high seas not for any central governmental purpose but rather as a proprietary function.[25]
This leaves the final question of whether Congress, in enacting the Jones Act, manifested its intention to abrogate a state's Eleventh Amendment immunity and subject it to suits for damages in federal court. Since Congress, in incorporating FELA into the Jones Act, intended to apply the Jones Act to all employers of seamen, Petty v. Tennessee-Missouri Comm'n, supra, there is every reason to treat employers under the Jones Act the same as employers under FELA. As the Supreme Court stated in Parden:
We think that Congress, in making FELA applicable to "every" common carrier by railroad in interstate commerce, meant what it said. That congressional statutes regulating railroads in interstate commerce apply to such railroads whether they are state owned or privately owned is hardly a novel proposition; ....
377 U.S. at 187-188, 84 S.Ct. at 1210. Since it is more and more common for states to operate vessels on the navigable waters of the United States or on the high seas, e. g., ferry services and research vessels, Congress must have understood that it could be subjecting the states to suit. See Mifsud v. Palisades Geophysical Institute, Inc., supra; Huckins, supra; Cocherl, supra.
The fact that these actions could have been brought in state courts under the Jones Act does not change this conclusion since seamen and their dependents have the right under the Jones Act to elect either federal or state court.[26] 46 U.S.C. § 688. This specific provision for election of a forum as authorized by the statute would be rendered meaningless with respect to the states if the Eleventh Amendment were a bar. This situation was cited in Hutto v. *905 Finney, supra 437 U.S. at 698 n. 31, 98 S.Ct. at 2577 n. 31, as a basis for discerning Congress' intent to abrogate the states' immunity. See also Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); Palila, supra at 997.

b. Death on the High Seas Act
The DOHSA provides a right of action for any person whose death occurs on the high seas more than a marine league from shore and is caused by wrongful act, neglect, or default. Prior to enactment of the DOHSA, there was no remedy under general maritime law for death occurring on the high seas. In 1920, under its admiralty and maritime power, Congress acted to create the remedy for claims based on negligence or unseaworthiness. Moragne, supra 398 U.S. at 393-394, 90 S.Ct. at 1783-1784. The legislative history of the DOHSA indicates that it was passed, in part, to achieve uniformity in this important area of federal power. The United States Supreme Court, quoting from the legislative history of the Act, stated:
"There is no reason why the admiralty law of the United States should longer depend on the statute laws of the States.... Congress can now bring our maritime law into line with the laws of those enlightened nations which confer a right of action for death at sea." The Act would accomplish that result "for deaths on the high seas, leaving unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States.... This is for the purpose of uniformity, as the States can not properly legislate for the high seas." S.Rep.No.216, 66th Cong., 1st Sess., 3, 4 (1919); H.R.Rep.No.674, 66th Cong., 2d Sess., 3, 4 (1920). The discussion of the bill on the floor of the House evidenced the same concern that a cause of action be provided "in cases where there is now no remedy," 59 Cong.Rec. 4486, ....
Moragne, supra at 397, 90 S.Ct. at 1786.
The DOHSA was passed almost simultaneously with the Jones Act and shared with it the desire of Congress for uniformity in the area of admiralty and maritime remedies. Therefore, consistent with the discussion of constructive waiver as to the Jones Act, Congress had the power to abrogate state immunity in its exercise of its admiralty and maritime power and the state defendants impliedly consented to be sued by entering the federally regulated area  i. e., by operating a vessel on the high seas.
This again leaves the final question of whether, in enacting the DOHSA, Congress manifested its intent to abrogate the states' Eleventh Amendment immunity. The question as to the DOHSA is different than that as to the Jones Act since the DOHSA does not incorporate the principles of FELA or of any other similar, previously analyzed statute. See Parden, supra. However, the language of the DOHSA convinces this Court that Congress, by: (1) the granting of exclusive jurisdiction to the United States district courts, in admiralty, and (2) the subjecting of vessels, persons or corporations to suits, intended to abrogate the states' immunity.
The DOHSA, in pertinent part, provides: ... the personal representatives of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, ....[27]
This language provides for exclusive jurisdiction of the United States district courts. Barbe v. Drummond, 507 F.2d 794, 801 n. 10 (1st Cir. 1974); Berry v. Pacific Sportfishing, Inc., 372 F.2d 213, 215 (9th Cir. 1967); Trihey v. Transocean Airlines, 255 F.2d 824, 827 (9th Cir. 1958); Higa v. Transocean Airlines, 230 F.2d 780 (9 Cir. 1956), cert. dismissed, 352 U.S. 802, 77 S.Ct. 20, 1 *906 L.Ed.2d 37 (1956); Jennings v. Goodyear Aircraft Corp., D.C., 227 F.Supp. 246 (1964); Devlin v. Flying Tiger Lines, Inc., 220 F.Supp. 924 (D.N.Y.1963); Wilson v. Transocean Airlines, 121 F.Supp. 85 (D.Cal.1954). This grant of exclusive jurisdiction in an area of regulation that is reserved to the federal government indicates the intent of Congress to subject to suit in federal court all those responsible for deaths on the high seas.[28] The remedy under the DOHSA, like the right under the Jones Act to election of a court by a seaman, would be rendered meaningless with respect to the states if the Eleventh Amendment were a bar. See discussion under Jones Act, supra.
In addition, the DOHSA expressly provides that corporations are liable under the Act. No distinction is made between public and private corporations. The UH, Hawaii Constitution, Art. IX, § 4, and the RCUH were established by the legislature as public corporations, Hawaii Rev.Stat. §§ 304-2 and 307-1, respectively. Article 9, § 9 of the California Constitution establishes the UC as a "public trust, to be administered by the existing corporation known as `The Regents of the University of California, ....'" (emphasis added). The Regents of the UC, as indicated by that defendant, is the proper California state defendant here. These three state defendants, if not technically the State of Hawaii as a named defendant, are within the express coverage of the DOHSAa fact that indicates that Congress intended to allow plaintiffs to reach such entities through the DOHSA.
Based on the enactment of the Jones Act and the DOHSA and on the voluntary entry by the states of California and Hawaii into the federally regulated admiralty and maritime area, all the state defendants have effected constructive waivers of their Eleventh Amendment immunity.

SUMMARY
1. For purposes of these motions to dismiss based on the Eleventh Amendment and subject to further findings of fact as to the RCUH, each of the state defendants, absent consent or waiver, is entitled to assert the Eleventh Amendment bar to an award of retrospective damages in a private action.
2. The State of Hawaii defendants expressly have consented to suit in federal court based on tort causes of action and for retrospective damages via Hawaii Rev.Stat. §§ 661-11 and/or 662-2 and 662-3.
3. The Regents of the University of California have not expressly consented by statute to suit in federal court.
4. The Regents of the University of California by the terms of its master contract with the United States, and the Hawaii state defendants by the terms of the master contract and the subcontracts, expressly have consented to suit in federal court.
5. Based on the enactment of the Jones Act and the DOHSA and on the voluntary entry by all of the defendants into the federally regulated admiralty and maritime area, each of the state defendants has effected a constructive waiver of its Eleventh Amendment immunity.
The complete picture of the decisions by the two states to seek and to undertake paid research for the United States Government, in the interest of the common defense and security of the United States, and to operate a vessel on the high seas as part of the performance of that research, provides overwhelming implications that the two states, through their agencies, clearly must have understood that they were subjecting themselves to a myriad of areas of federal jurisdiction, both concurrent and exclusive. In the face of that, both states chose the path of Icarus who, while Daedalus watched, flew too close to the sun, melted the wax on his feathered wings and fell into the sea. The total consequences may have been unknown  they surely did not expect the HOLOHOLO to go down  but the possibility *907 of facing claims in federal court brought by the United States, the other state, or private citizens must have been obvious.[29]
Accordingly, IT IS HEREBY ORDERED that the MOTIONS TO DISMISS of the State of Hawaii, the University of Hawaii, the Research Corporation of the University of Hawaii and The Regents of the University of California are DENIED.[30] The parties may take steps to resume discovery immediately.
NOTES
[1] Contract between The Regents of the University of California and the United States of America (Department of Energy), Contract No. W-7405-ENG-48, Modification No. 23 of Supplemental Agreement, Lawrence Berkeley Laboratory and Lawrence Livermore Laboratory.
[2] The search covered 377,000 square miles in more than 520 flight hours, including four Air Force U-2 reconnaissance flights. On December 17, a current meter box thought to be from the HOLOHOLO was found by a commercial fisherman about six miles from the southwestern coast of the Island of Hawaii and about 50 nautical miles south of the research site.

On December 13, 1979, a year after the HOLOHOLO's disappearance, a National Oceanic and Atmospheric Administration (NOAA) ship positively identified transponder replies to coded acoustic signals as coming from an instrument or instruments similar to those that had been aboard the vessel. In its official report, the National Transportation Safety Board concluded that the HOLOHOLO had sunk where the transponder replies had originated, a site about 17 nautical miles northwest of the intended research site. The signals came from a depth of 7,200 feet in the Alenuihaha Channel, 28 miles south of the Island of Maui. National Transportation Safety Board, Sinking of the M/V HOLOHOLO in the Pacific Ocean near the Hawaiian Islands December 1978 (NTSB-MAR-80-15, 1980). See also Honolulu Star-Bulletin, Dec. 13, 1979, at 1, col. 1.
[3] One marine league is three nautical miles.
[4] In Ex parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921), the U. S. Supreme Court held that the Eleventh Amendment applied to actions in admiralty. The amendment also has been construed to apply to citizens of the same state. See Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).
[5] Some of the factors are "whether the entity sued is performing a governmental or proprietary function, whether it has been separately incorporated, whether it has been granted the power to sue and be sued and enter into contracts, the degree of autonomy over its operations, and whether the state has immunized itself from responsibility for the agency's operations." Jackson Sawmill Co. v. United States, 580 F.2d 302, 308 (8th Cir. 1978).
[6] The California defendant correctly points out that the suable entity is The Regents of the University of California.
[7] Although the language of the Eleventh Amendment indicates that it serves as a protection for the states against suit in federal court, it has been interpreted from the beginning to be an expression within the United States Constitution of the states' sovereign immunity. Monaco v. Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934); Hans v. Louisiana, supra note 4. This explains why a state may consent to suit in federal court when the language of the amendment indicates that it is a limit on judicial power. Clark v. Barnard, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883). While this Court recognizes the distinction between Eleventh Amendment and common law immunity, the state waiver statutes involved in the analysis of these motions were examined to determine the extent of the waiver of sovereign immunity, including the Eleventh Amendment.
[8] The RCUH argues that it is the state for Eleventh Amendment purposes but also argues that the state statutes discussed may not apply to it fully. The RCUH cannot claim to be the state and then say it is not subject to the state's waiver, where the state waiver statutes do not except it.
[9] The legislative history of this section establishes this as the correct interpretation. The Conference Committee Report states:

As amended by the Senate, this bill provides that the defense of sovereign immunity shall not be raised by the Territory in any suit where the Territory and the subject matter of the claim is covered by insurance. Heretofore, there has been some question as to whether or not the Territory had waived its immunity to suit in cases where the subject matter was covered by insurance.... This bill, as amended by the Senate, will eliminate any ambiguity as to such waiver of immunity. (emphasis added) Conference Committee Report No. 33 on H.B. No. 254, Senate Journal 1955, p. 700; Conference Committee Report No. 28 on H.B. No. 254, House Journal 1955, p. 920.
[10] A complaint for interpleader and for declaratory relief was filed in this Court on August 3, 1979, by Continental Insurance Company, a New York corporation, against, to the best of Continental's knowledge, the surviving spouses, children, fathers, mothers, heirs or other dependent persons, and against the RCUH. Civil No. 79-0327. The RCUH is the named insured and the party most directly responsible for contracting for the services of the HOLOHOLO. Since it is a state entity, the state is covered by insurance for purposes of section 661-11. Also, the agreement by the United States to indemnify the UC and of the UC to consider the costs of defense of a suit by the UH to be an allowable expense under the subcontract constitutes an "insurance policy" under section 661-11. "Insurance" is defined by Hawaii Rev.Stat. § 431-3(a) (1976) as:

A contract whereby one undertakes to indemnify or pay a specified amount upon determinable consequences.
Therefore, the Hawaii defendants are covered, in addition to the RCUH policy, by insurance provided by the terms of the contract and subcontract. This coverage could be significant in a final determination of the limits of any liability of the state defendants.
The Continental policy is the only one of which this Court is aware at this time that provides coverage of the RCUH. However, it is common for such corporate entities to carry umbrella policies and further discovery may reveal such coverage.
[11] Plaintiffs Harvey and Niemeyer urge this Court to find that the decision by the State of Hawaii defendants to engage in exploration, development, and utilization of the sea under federal, state, and private research contracts and grants was based on the exercise of a discretionary function or duty under Hawaii Rev.Stat. § 662-15(1). While this is a possible construction of the actions of the state that would establish the applicability of section 661-11, the theories and facts in these cases are not adequately established at this point to determine whether the actions of the state were sufficiently discretionary to render chapter 662 inapplicable (and, therefore, chapter 661 applicable).
[12] The article continues:

The University shall keep the Contracting Officer fully informed of the conduct of such proceedings including furnishing immediate notice of all known actions and of all claims filed and all pertinent papers received or filed. The University also shall make appropriate assignments upon request of the Contracting Officer to enable the Government to protect its interests by litigation or otherwise. If required by the Contracting Officer in order to protect important interests of the Government, the University shall authorize representatives of the Government to settle or defend any such litigation or claims and to represent the University in or take charge of, any such proceedings. In the handling of such claims or litigation by the University or the Government, each party shall obtain and receive the full collaboration of the other.
[13] Part five describes the obligations of the Administration upon completion or termination of the agreement.
[14] This aspect of the contract could render the Eleventh Amendment inapplicable to these state defendants. See discussion in text, supra. The discussion here is based on the implicit holding that the amendment is applicable since the exact nature and extent of the indemnification are not clear.
[15] 28 U.S.C. § 1338 provides:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.
See also Lemelson v. Ampex Corp. and Illinois Bureau of Investigations, 372 F.Supp. 708 (N.D. Ill.1974).
[16] The two appendices are inapplicable to the Eleventh Amendment issue except for the possible applicability of I.B.7. of Appendix A, which provides that the UC may, upon approval on a case-by-case basis, allow payment for bonds and insurance, including self-insurance, to be included by the Subcontractor as a cost of doing the work.
[17] The Subcontractor shall give the University immediate notice in writing of 1) any action, including any proceeding before an administrative agency, filed against the Subcontractor arising out of the performance of this Subcontract, and 2) any claim against the Subcontractor, the cost and expense of which is allowable under APPENDIX A-REIMBURSEMENT OF COSTS. Except as otherwise directed by the University in writing, the Subcontractor shall furnish immediately to the University copies of all pertinent papers received by the Subcontractor with respect to such action or claim. To the extent not in conflict with any applicable policy of insurance, the Subcontractor may, with the University's approval, settle any such action or claim, shall effect at the University's request an assignment and subrogation in favor of ERDA of all the Subcontractor's rights and claims (except those against the University) arising out of any such action or claim against the Subcontractor; and, if required by the University, shall authorize representatives of the University or Government to settle or defend any such action or claim and to represent the Subcontractor in or to take charge of any action. If the settlement or defense of an action or claim against the Subcontractor is undertaken by the University or Government the Subcontractor shall furnish all reasonable assistance in effecting a settlement or asserting a defense. Where an action against the Subcontractor is not covered by a policy of insurance, the Subcontractor shall, with the approval of the University, proceed with the defense of the action in good faith, and in such event the defense of the action shall be an allowable expense hereunder: Provided, however, that such expense shall not be allowable to the extent that it would have been compensated for by insurance which was required by law or by the written direction of the University, but which the Subcontractor failed to secure through its own fault or negligence. In addition, ARTICLE VIII-PAYMENTS, PART E-FINANCIAL SETTLEMENT, provides that the UC may become responsible for any claims against the subcontractor arising out of the performance of the work where the UC had made final payment under the subcontract and the UH is unaware of the claim when the release is executed.
[18] Where the United States brings suit against a State, the Supreme Court has original but not exclusive jurisdiction. 28 U.S.C. § 1251(b)(2). The action may be brought in district court and the state's consent is not required. United States v. Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950).
[19] Article XXVIII-SPECIAL HAZARDS of the master contract gives the UC the right to make payments up to $10,000 each to employees who are disabled or die as a result of exposure to a "special hazard" in the course of their work under the contract. Though the provision does not expressly include trips on research vessels in the definition of special hazard, it does include trips on military aircraft and vessels and "exposure peculiar to and as the result of work assignment required to be conducted outside the Continental United States." The article defines "employee" as:

any person who is or has been employed by the University or any subcontractor, or who is or has been engaged as a consultant or borrowed personnel by the University or any subcontractor, and who has become disabled or has died as a result of the special hazards, as referred to in paragraph 2. of this Article, encountered by the University in the conduct of its operations under this contract.
These definitions appear to cover both the decedents and the circumstances under which they died. This provision is not cited to suggest that $10,000 is an appropriate measure of damages should liability be established, but rather to indicate the contemplation in the contract of the state defendants' possible liability for an event like that which is the subject of these cases.
[20] Query whether, if the Energy Reorganization Act, 42 U.S.C. §§ 5801-5891 (1977), under the authority of which these contracts were entered, were passed by Congress under its war power, a constructive waiver may have been effected under the theory of Petty v. Tennessee-Missouri Comm'n, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959)? See also Peel v. Florida Dept. of Transportation, 600 F.2d 1070 (5th Cir. 1979); Jennings v. Illinois Office of Educ., 589 F.2d 935 (7th Cir. 1979).
[21] 28 U.S.C. § 1333 provides:

The district courts shall have original jurisdiction, exclusive of the courts of the States of:
(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.
[22] See Edelman v. Jordan, supra; Employees of Missouri Dept. of Public Health & Welfare v. Missouri Dept. of Public Health & Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). As one commentator has pointed out:

Abandonment of the "constructive waiver" doctrine, based on a misleading analogy to the rules protecting against constructive waiver of an individual's constitutional rights, would constitute a significant retreat from the attempt to make the state responsible in federal court for the violation of federal rights.
M. Redish, Federal Jurisdiction: Tensions on the Allocation of Judicial Power 168 (1980).
[23] See National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).
[24] Though article I of the Constitution contains no express language of a grant of the admiralty or maritime power to the Congress, the grant of exclusive judicial power in admiralty and maritime matters in article III, coupled with the Necessary and Proper Clause, has long been interpreted by the Supreme Court to be a grant of exclusive power in that area to the Congress. Panama R.R. Co. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748 (1924); Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); Butler v. Boston and S.S.S. Co., 130 U.S. 527, 9 S.Ct. 612, 32 L.Ed. 1017 (1889); The Lottawanna, 21 Wall (88 U.S.) 558, 22 L.Ed. 654 (1875); Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 459 F.Supp. 507, 524 (S.D.Fla.1978), aff'd 621 F.2d 1340 (5th Cir. 1980).
[25] The distinction between the types of state activities involved may be a critical one in a determination of whether a constructive waiver has taken place. See Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines, 126 U.Pa.L.Rev. 515-549; 1203-1280, 1239 (1978); Baker, Federalism and the Eleventh Amendment, 48 U.Colo.L.Rev. 139 (1977). The type of activity apparently was critical in the finding in Employees v. Missouri, supra note 22, that Congress had not intended to abrogate state immunity in enacting the Fair Labor Standards Act (FLSA). As the Court stated:

Parden involved the railroad business which Alabama operated "for profit." ... Parden was in the area where private persons and corporations normally ran the enterprise. 377 U.S. at 185, 84 S.Ct. at 1209.
See also Rivet v. East Point Marine Corp., 325 F.Supp. 1265 (S.D.Ala.1971).
[26] FELA specifically provides that no case brought in state court may be removed to federal court. 45 U.S.C. § 56 (1975). This provision is applicable to the Jones Act.
[27] This language stands in sharp contrast to that in the Jones Act though the two statutes were passed at the same time. The Jones Act provides:

Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located. 46 U.S.C. § 688.
This language consistently has been interpreted to provide for concurrent jurisdiction of state and federal courts. See discussion in text, supra.
[28] Though some state wrongful death statutes may be read to extend to deaths on the high seas, recent U. S. Supreme Court cases suggest that the DOHSA and general maritime law provide the only causes of action for deaths on the high seas and preempt any state-created remedies, at least as to nonseamen. Mobil Oil Corp., supra; Moragne, supra.
[29] As I stated in dissent in reference to the doctrine of sovereign immunity:

But the extension of the doctrine of sovereign immunity to this type of situation is itself unnecessary. There is no magic in the phrase apart from its historical justification. To pay automatic homage to this abracadabra whenever the state is an unwilling party to a legal action is to abandon reason for obeisance.
Sovereign immunity as a principle of the common law should be limited to actions which could threaten the operation of the government and should not be a shield behind which the government can engage in conduct which it forbids to its own citizens.
A. C. Chock, Ltd. v. Kaneshiro, 51 Hawaii 87, 94, 451 P.2d 809 (1969).
[30] This order has no present effect on three other cases (Civil Nos. 80-0622, 80-0626 and 80-0461) filed in this Court by representatives of HOLOHOLO decedents and, for various reasons, not yet consolidated with the six cases that are the subject of this order. However, this order may be determinative of issues that might be raised in the three nonconsolidated cases.