**June E. HOEFFNER and Paul J. Hoeffner, Plaintiffs,**

v.

**UNIVERSITY OF MINNESOTA and John S. Najarian, M.D., Defendants.**

**Civil No. 3–95–958.**

United States District Court, D. Minnesota, Third Division.

July 29, 1996.

Leslie A. Gelhar, for plaintiffs.

Mark A. Bohnhorst, Minneapolis, MN, for University of Minnesota.

Trudi Noel Trysla, for defendant John S. Najarian, M.D.

## ORDER

DAVIS, District Judge.

The above-entitled matter comes before the Court upon Plaintiff's objections to the Report and Recommendation of the United States Magistrate Judge Raymond L. Erickson dated July 29, 1996. Plaintiff objects to the Report and Recommendation dismissing the Complaint against the University of Minnesota with prejudice on the basis of Eleventh Amendment immunity.

Pursuant to statute, the Court has conducted a *de novo* review of the record. 28 U.S.C. § 636(b)(1); Local Rule 72.1(c). Based on that review the Court ADOPTS the Report and Recommendation dated July 29, 1996.

Accordingly, IT IS HEREBY ORDERED that the University of Minnesota's Motion to Dismiss [Clerk Docket Nos. 4 and 14] is GRANTED and all claims against the University of Minnesota are dismissed with prejudice.

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon the Motion of the Defendant University of Minnesota (the "University") to dismiss the Plaintiffs' claims against it for lack of subject matter jurisdiction.

For reasons which follow we recommend that the Motion to Dismiss be granted.

### II. *Factual and Procedural History*

The Plaintiffs are a married couple, who are residents and citizens of the State of New York. On October 14, 1986, June Hoeffner gave birth to a son, Andrew Hoeffner ("Andrew"). In February of 1988, while hospitalized at the University of Minnesota Hospital and Clinic in Minneapolis, Minnesota,

Andrew underwent a kidney transplant, with his mother serving as the kidney's donor. Following that surgery, a biologic drug product known as Antilymphocyte Globulin, or "ALG",[1] was administered to Andrew. Andrew's system soon rejected his donated kidney, purportedly as a result of an adverse reaction to ALG. In July of 1988, Andrew underwent a second kidney transplant, which was, again, performed at the University's Hospital and Clinic but, on this occasion, the kidney was provided by a deceased donor. Following this second transplant, Andrew was, again, treated with ALG. Sadly, Andrew's second transplant also failed because of organ rejection—again, assertedly precipitated by an adverse reaction to ALG—and, on December 28, 1988, Andrew passed away.

On October 17, 1995, the Plaintiffs commenced this action by the filing of a Complaint which, on November 24, 1995, they amended. In their Amended Complaint, the Plaintiffs, in their capacities as the parents of Andrew, seek damages from the Defendants for his medical expenses, for his alleged wrongful death, and for a loss of consortium. In addition, Andrew's mother seeks damages for the injuries that arose as the donor of Andrew's first rejected kidney. In seeking these damages, the Plaintiffs rely on a variety of State law causes of action.[2]

In responding to the Plaintiffs' Amended Complaint, on November 8, 1995, the University filed a Motion to Dismiss the Plaintiffs' claims against it, in accordance with Rule 12(b)(1), Federal Rules of Civil Procedure, for an asserted lack of subject matter jurisdiction. The University contends that the Eleventh Amendment of the United States Constitution prohibits the Plaintiffs from bringing their claims against it in this Court.

## III. *Discussion*

A. *Standard of Review.* Rule 12(b)(1), Federal Rules of Civil Procedure, allows a party to interpose the defense of a "lack of jurisdiction over the subject matter" of the Plaintiff's claim. Moreover, Rule 12(h)(3), Federal Rules of Civil Procedure, directs us to dismiss an action "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter * * *." These provisions are consistent with the core truth that "federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equipment Management Co. v. United States,* 4 F.3d 643, 646 (8th Cir.1993), citing *Bender v. Williamsport Area School District,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986), citing in turn *Marbury v. Madison,* 1 Cranch 137 [5 U.S. 137] 2 L.Ed. 60 (1803). A Federal Court, therefore, has a primordial duty, in every case before it, to inquire whether the vital prerequisite of subject matter jurisdiction has been satisfied. *Bradley v. American Postal Workers Union, AFL–CIO,* 962 F.2d 800, 802 n. 3 (8th Cir.1992); *Thomas v. Basham,* 931 F.2d 521, 523 (8th Cir.1991); *Woodke v. Dahm,* 873 F.Supp. 179, 185 (N.D.Iowa 1995), aff'd, 70 F.3d 983 (8th Cir. 1995).

To prevail upon a Motion to Dismiss for want of subject matter jurisdiction, the challenging party must successfully attack the Complaint, either on its face or on the factual truthfulness of its averments. *Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993); *Osborn v. United States,* 918 F.2d 724, 729 n. 6 (1990). In a facial challenge to jurisdiction,

1. ALG is administered to the recipients of transplanted human organs in order to suppress the body's immune response, and to prevent and treat the rejection of the transplanted organs. ALG was both developed and globally distributed by the Defendants, through the Minnesota ALG Program, during the period from approximately January of 1971, through August of 1992. See, *United States v. Najarian,* 915 F.Supp. 1460, 1463–64 (D.Minn.1996).

2. In their Amended Complaint, the Plaintiffs have asserted claims premised upon strict liabili-

ty, negligent manufacture, medical malpractice, battery, breach of implied and express warranty, breach of warranty of fitness for purpose, fraud, negligent misrepresentation, failure to warn, a violation of Minnesota Statutes Sections 325F.68–70, and false advertising. The Amended Complaint also alleges that the Defendants' purported failure to comply with the Regulations of the United States Food and Drug Administration, as they applied to their administration of ALG to Andrew, constituted negligence *per se.*

all of the factual allegations, as contained in the non-moving party's pleadings, which concern the jurisdictional issue, are presumed to be true and, therefore, the non-moving party receives the same protections that it would receive if it were defending against a Motion to Dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure. Nevertheless, a Rule 12(b)(1) Motion will prove to be successful if the plaintiff should fail to allege an element necessary for a finding of subject matter jurisdiction. *Titus v. Sullivan,* supra; *Wittmann v. United States,* 869 F.Supp. 726, 729 (E.D.Mo.1994).

■ In a factual challenge to subject matter jurisdiction, the Court considers matters outside of the pleadings, the non-moving parties do not have the benefit of the safeguards of Rule 12(b)(6), and no presumption of truthfulness attaches to the factual allegations. Indeed, the non-moving party bears the burden of proving that jurisdiction does exist. *Osborn v. United States,* supra at 729–30. Furthermore, as the issue of subject matter jurisdiction concerns the pivotal issue of the Court's ability to hear a case, the Court has authority—denied to it in a Rule 56 Motion for Summary Judgment—to weigh the evidence in deciding whether it has the power to entertain the action. *Id.*

B. *Legal Analysis.*[3] In seeking a dismissal from this action, the University maintains that it is an instrumentality of the State of Minnesota and, therefore, is immune from suit by these Plaintiffs in a Federal Court.[4] As a result, the disposition of this Motion necessarily hinges upon the resolution of three issues:

1. Is the University an "instrumentality" of the State for purposes of the Eleventh Amendment?

2. If the University is a State instrumentality, has it waived its Eleventh Amendment immunity?

3. If the University is a State instrumentality, has Congress abrogated its Eleventh Amendment immunity?

We address each of these issues in turn.

1. *Is the University an Instrumentality of the State of Minnesota?*

a. *Standard of Review.* The Eleventh Amendment, by its express terms, prevents the exercise of the "Judicial power of the United States" against a State by citizens of another State. See, *U.S. CONST. Amend. XI;* see also, *In re New York,* 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921); *Fitts v. McGhee,* 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899).[5] The Amendment is founded upon "[a] recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity[;] [and] [i]t thus accords the States the respect owed them as members of the federation." *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 689, 121 L.Ed.2d 605 (1993).

■ Moreover, "[a] state agency or a state official may invoke the State's Eleventh Amendment immunity if immunity will 'protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.'" *Hadley v. North Arkansas Community Technical College,* 76 F.3d 1437, 1438 (8th Cir.1996), quoting *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 123 n. 34, 104 S.Ct. 900, 920 n. 34, 79

---

**3.** As a threshold matter, we construe this jurisdictional challenge as being factual in nature, for the parties have submitted affidavits and other documentary evidence, that are outside of their pleadings, in order to bolster their respective legal arguments, and we have relied upon these submissions in resolving the dispute before us.

**4.** We understand that, in an exercise of caution, the Plaintiffs have commenced a paralleling action in a Minnesota State Court.

**5.** In addition, for over a century, the Supreme Court has interpreted the Eleventh Amendment

as a bar to suits in Federal Court against an unconsenting State by its own citizens, as well as by citizens of other States. *Hans v. Louisiana,* 134 U.S. 1, 13, 10 S.Ct. 504, 506, 33 L.Ed. 842 (1890); see also, *Seminole Tribe of Florida v. Florida,* ── U.S. ──, ──, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996); *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991). Obviously, the doctrine of *Hans v. Louisiana* has no application here, as the Plaintiffs are citizens of New York, and not of Minnesota.

L.Ed.2d 67 (1984). Accordingly, Eleventh Amendment immunity extends to instrumentalities of the State which act as "arm[s] of the State." *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977). On the other hand, Eleventh Amendment immunity does not embrace independent political subdivisions created by the State, such as Counties and Cities. See, e.g., *Mount Healthy City School District Board of Education v. Doyle,* supra; *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890).

■ Therefore, our inquiry must focus upon two factors. First, and foremost, we must determine whether the State treasury would be exposed to liability in damages and, second, we must decide whether the State controls the entity in question. *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, ——, 115 S.Ct. 394, 400, 130 L.Ed.2d 245 (1994); *Hadley v. North Arkansas Community Technical College,* supra at 1439; *Thomas v. FAG Bearings Corp.,* 50 F.3d 502, 506 (8th Cir.1995). In keeping with this framework, "[s]tate universities and colleges almost always enjoy Eleventh Amendment immunity." *Hadley v. North Arkansas Community Technical College,* supra at 1438; see also, *Dover Elevator Co. v. Arkansas State University,* 64 F.3d 442, 446–47 (8th Cir.1995); *Sherman v. Curators of the University of Missouri,* 16 F.3d 860, 863 n. 2 (8th Cir.1994).

b. *Legal Analysis.* In opposing the University's Motion, the Plaintiffs have broadly argued that the University is not an "instrumentality" of the State for purposes of the Eleventh Amendment. Alternatively, the Plaintiffs advance the much narrower argument that the University does not enjoy Eleventh Amendment immunity here, because of the unique and special circumstances that are presented by this case. We disagree with each proposition.

1) *The University is an Instrumentality of the State.*

■ Over the last quarter of a century, our Court of Appeals has consistently found the University to be an instrumentality of the State of Minnesota for Eleventh Amendment purposes. See, *Treleven v. University of Minnesota,* 73 F.3d 816, 818–19 (8th Cir. 1996); *Richmond v. Board of Regents of the University of Minnesota,* 957 F.2d 595, 598–99 (8th Cir.1992); *Schuler v. University of Minnesota,* 788 F.2d 510, 516 (8th Cir.1986), cert. denied, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *Walstad v. University of Minnesota Hospitals,* 442 F.2d 634, 641–42 (8th Cir.1971); see also, *Halikas v. University of Minnesota,* 856 F.Supp. 1331, 1336 (D.Minn.1994); *Nomi v. Regents for the University of Minnesota,* 796 F.Supp. 412, 416 (D.Minn.1992), vacated on other grounds, 5 F.3d 332 (8th Cir.1993); but cf., *Perez–Lacey v. University of Minnesota,* 655 F.Supp. 1066, 1067–68 (D.Minn.1987) (The University is not entitled to Eleventh Amendment Immunity on the Plaintiff's Federal law claims.); *Durham v. Parks,* 564 F.Supp. 244, 249 (D.Minn.1983) (The University is not an instrumentality of the State for purposes of Eleventh Amendment.).

The Court first addressed this issue in *Walstad v. University of Minnesota Hospitals,* supra. There, as here, the Plaintiffs sought to hold the University's Hospital and Clinic liable on asserted claims of negligence and professional malpractice. In concluding that the Eleventh Amendment barred the Plaintiffs' action, the Court found particular significance in the structural relationship between the University and the State:

Article VIII, § 3 of the Minnesota Constitution [amended and recodified in 1974 as art. XIII, § 3] provides that the University of Minnesota is an instrumentality of the state and expressly reserves all immunities to the University. The University of Minnesota Hospitals are of course a part of the Medical School of the University. M.S.A. § 158.01.

*Id.* at 641–42.

As we have noted, the Court adhered to this finding of Eleventh Amendment immunity in its subsequent decisions in *Schuler v. University of Minnesota,* supra, and *Richmond v. Board of Regents of the University of Minnesota,* supra.

In *Treleven v. University of Minnesota,* supra, the Court confronted an argument

that these prior decisions were no longer accurate statements of the law in light of the Court's intervening decisions in *Greenwood v. Ross,* 778 F.2d 448 (8th Cir.1985), and *Sherman v. Curators of the University of Missouri,* supra. In both of these decisions, the Court examined the following factors in determining whether a State University held Eleventh Amendment immunity:

(1) whether the action is in reality an action against the State as a result of the entity's "powers and characteristics" under State law;

(2) whether the entity is autonomous and exercises a significant degree of control over its own affairs; and

(3) whether the funds in payment of an award in damages will be derived from the State treasury.

*Greenwood v. Ross,* supra at 453; see also, *Sherman v. Curators of the University of Missouri,* supra at 863 (remanding case for consideration of status of University of Missouri in light of *Greenwood* factors).

In *Treleven,* the plaintiff urged that the *Walstad, Richmond* and *Schuler* decisions could no longer serve as precedential support for the proposition that the University of Minnesota should enjoy Eleventh Amendment immunity.

The Court, however, disagreed, and rejected the assertion that the analysis in either *Greenwood* or *Sherman* had undermined the holdings in *Walstad* and in its progeny:

This Court's holding in Walstad, followed in Richmond and Schuler, is not altered by either Greenwood or Sherman. *Greenwood and Sherman set forth factors for district courts to consider when they are confronted with an Eleventh Amendment question of first impression.* The District Court in this case had no need to consider the Greenwood factors; it had before it the prior decisions of this Court adjudicating the question of the University's relationship with the state. In these circumstances, the District Court properly held that the University was an arm of the state and thus entitled to share in its Eleventh Amendment immunity.

*Treleven v. University of Minnesota,* supra at 819 [emphasis added] [footnote omitted].

Notably, while the Court remanded the case to the District Court on a separate issue, it expressly declined the plaintiff's invitation to remand on the Eleventh Amendment issue, so as to allow the District Court to apply the *Greenwood* factors, and make detailed findings of fact concerning the University of Minnesota's relationship with the State of Minnesota. *Id.* at 818–19.

The *Treleven* decision, therefore, directly and convincingly reaffirms the Court's prior holdings that the University is an Eleventh Amendment "instrumentality" of the State of Minnesota. Nevertheless, in a footnote, the Court in *Treleven* made the following observation:

[The plaintiff] offered no evidence that the relationship between the University and the state has changed since our 1971 Walstad decision.

*Id.* at 819 n. 3.

At the Hearing in this matter, we invited the parties' comment on the import of this footnote and, particularly, on their views as to whether the relationship between the University and the State had changed, in any substantive respect, since the Court's decision in *Walstad.*

In response to this inquiry, the University has urged that the footnote in *Treleven* was no more than a reflection that the Record in that case demonstrated no alteration in Minnesota's constitutional or statutory law which would have any ramification on the University's entitlement to Eleven Amendment immunity. Indeed, the University maintains that the same circumstance continues to this date. In turn, the Plaintiffs concede that, since 1971, no modification of substance has occurred in Minnesota's Constitution, which would affect the longstanding relation between the State and the University, but they argue that significant changes in Minnesota's statutory law, and in the nature of the University's role in the State, have occurred which amply warrant a reexamination of the University's status for Eleventh Amendment purposes.

First, the Plaintiffs contend that, in 1976, when the Minnesota Tort Claims Act, see, *Minnesota Statutes Section 3.736*, was enacted, an alteration in the relationship between the State and the University occurred, because the State waived its immunity from liability for torts that have been committed by State employees who were acting in the course and scope of their employment. We disagree for, under the Tort Claims Act, the legislature defined the term "State" to include the University of Minnesota. See, *Minnesota Statutes Section 3.732, Subdivision 1(1)*. As a consequence, the enactment of the Tort Claims Act made no changes in the relationship between the State and the University but, rather, merely opened the State—to include the University—to tort claims arising from the conduct of State employees. See, *Minnesota Statutes Sections 3.732, 3.736*.

Next, the Plaintiffs argue that, since the decision in *Walstad* was issued, the character of both the University, and its Hospital and Clinic, have evolved from their traditional governmental roles, so as to work a fundamental alteration in their relationship to the State. Specifically, the Plaintiffs maintain that the University Hospital and Clinic has evolved from its original status as a "charity hospital," which served the medical needs of the State's indigent residents, into a proprietary enterprise, which serves as the functional equivalent of a private hospital. In support of this assertion, the Plaintiffs primarily rely upon the Minnesota Supreme Court's decision in *Stein v. Regents of the University of Minnesota*, 282 N.W.2d 552 (Minn.1979), where the Court found that the Hospital and Clinic was largely proprietary in character.[6] In addition, the Plaintiffs contend that, in operating the Minnesota ALG Program ("MALG Program"), the University assumed an even more dominant, proprietary role, by entering the competitive market of a drug manufacturer. The Plaintiffs assert that, through these dual proprietary roles, the University's relationship with the State has been significantly transformed in dimensions unknown at the time of *Walstad*. We reject this argument for two principal reasons.

■ First, in abolishing the University's common law immunity for torts committed at its Hospital and Clinic, the Court, in *Stein*, relied upon the distinctive dichotomy between governmental and proprietary functions, a dichotomy that has no bearing upon our Eleventh Amendment analysis.[7] As we

6. In *Stein v. Regents of the University of Minnesota*, 282 N.W.2d 552 (Minn.1979), the Minnesota Supreme Court addressed the issue of whether the operation of the University's Hospital and Clinic was a governmental activity, which would insulate it from common law tort liability—that is, liability for torts that were committed prior to the enactment of the Minnesota Tort Claims Act. See, *Minnesota Statutes Section 3.736*. The Court had previously held that sovereign immunity had no application to torts that arose from the State's engagement in proprietary activities. See, *Susla v. State*, 311 Minn. 166, 171, 247 N.W.2d 907 (1976). As a result, in resolving the issue before it in *Stein*, the Court focused upon whether the Hospital and Clinic's activities were primarily governmental or proprietary in character, and concluded that they were proprietary. *Stein v. Regents of the University of Minnesota*, supra at 556–59. Accordingly, the Court held that the University was not entitled to common law immunity for any torts committed in the proprietary actions of the Hospital and Clinic. *Id.* at 559.

7. Under the laws of Minnesota, the State's common law immunity is dependent upon the character of the activity at issue. If that activity is "governmental," then the immunity is available to the State and its instrumentalities, while it is not if the activity is proprietary. See, *Stein v. Regents of the University of Minnesota*, supra; *Susla v. State*, 311 Minn. 166, 171, 247 N.W.2d 907 (1976). To our knowledge, no similar dichotomy has even been applied within this Circuit—in the context of an Eleventh Amendment analysis—so as to ascertain the State's immunity from suit in a Federal Court. See, e.g., *Hadley v. North Arkansas Community Technical College*, 76 F.3d 1437 (8th Cir.1996); *Treleven v. University of Minnesota*, 73 F.3d 816 (8th Cir.1996); *Egerdahl v. Hibbing Community College*, 72 F.3d 615 (8th Cir.1995); *Dover Elevator Co. v. Arkansas State University*, 64 F.3d 442 (8th Cir.1995); *Thomas v. FAG Bearings Corp.*, 50 F.3d 502 (8th Cir.1995); *Sherman v. Curators of the University of Missouri*, 16 F.3d 860 (8th Cir.1994); *Richmond v. Board of Regents of the University of Minnesota*, 957 F.2d 595 (8th Cir.1992); *Schuler v. University of Minnesota*, 788 F.2d 510 (8th Cir.1986), cert. denied, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *Greenwood v. Ross*, 778 F.2d 448 (8th Cir.1985); *Walstad v. University of Minnesota Hospitals*, 442 F.2d 634 (8th Cir.1971); but see, *Doe v. Lawrence Livermore National Laboratory*, 65 F.3d 771 (9th Cir.1995), cert. granted by *Regents of University of California v. John Doe*, —— U.S. ——, 116 S.Ct. 2522,

have noted elsewhere, the relevant Eleventh Amendment inquiry concentrates only upon the State's control over the operative State entity, and the impact that an award of damages would have upon the State's treasury. See, *Hess v. Port Authority Trans–Hudson Corp.*, supra at 400; *Hadley v. North Arkansas Community Technical College*, supra at 1439; *Thomas v. FAG Bearings Corp.*, supra at 506.

Second, we are not persuaded that the proprietary functions that are served by the Hospital and Clinic, and by the MALG Program, are sufficient, in and of themselves, to evidence some form of alteration, in the relationship between the University and the State, that would have Eleventh Amendment significance. Here, the Plaintiffs have sued the University as a whole and, therefore, they seek a declaration that, as a whole, the University does not enjoy the immunity afforded by the Eleventh Amendment. With a recognition of the Plaintiff's goal, the evidence of Record overwhelmingly demonstrates that the University and the State remain inextricably interwoven in a closely entwined relationship.

In this respect, we note that, since the decision in *Walstad* was issued, the Minnesota Courts have consistently characterized the University as an instrumentality of the State. See, e.g., *Winberg v. University of Minnesota*, 499 N.W.2d 799, 802 (Minn.1993) (observing that the University is "a constitutional arm of the state", and not a "political subdivision"); *Miller v. Chou*, 257 N.W.2d 277, 278 (Minn.1977) ("[t]he Regents of the University of Minnesota is a unique entity, being both a constitutional corporation and an agency of the state"); *Bailey v. University of Minnesota*, 290 Minn. 359, 360, 187 N.W.2d 702 (1971) ("the university has a unique status as a constitutional corporation"). Furthermore, the Minnesota Statutes are rife with instances where the University is treated as a State instrumentality, or as the equivalent of a State agency. See, e.g., *Minnesota Statutes Section 3.732, Subdivision 1* (Minnesota Tort Claims Act); *Minnesota Statutes Section*

*16B.33, Subdivision 1(a)* (State Designer Selection Board Act); *Minnesota Statutes Section 79.34, Subdivision 1(2)* (State workers' compensation regimen); *Minnesota Statutes Section 135A.052, Subdivision 1(4)* ("the University of Minnesota * * * shall be the primary state supported academic agency for research and extension services").

In addition, the governing structure of the University evinces a starkly manifest interconnection between the intricacies of the University's administration, and the State of Minnesota. For example, the University is governed by a 12–member Board of Regents, each of whom is elected by the State Legislature. See, *State ex rel. Peterson v. Quinlivan*, 198 Minn. 65, 66, 268 N.W. 858 (1936), citing *Minn. Terr. Law 1851, ch. 3, § 4*, ratified by MINN. CONST. Art. XIII, § 3. When a vacancy in that Board occurs, the State's Governor is responsible for filling that vacancy by a temporary appointment. *Id.* at 67, 268 N.W. 858, citing *Minn. Terr. Law 1851, ch. 3, § 6*, ratified by MINN. CONST. Art. XIII, § 3. Moreover, each of the State's congressional districts must be represented on the Board, see, *Minnesota Statutes Section 137.024*, and the Regents themselves are required to make regular reports to the State's legislative and executive branches, on such matters as budgeting priorities, and the institution's mission statement. See, *Minn. Terr. Law 1851, ch. 3, § 16*, ratified by MINN. CONST. Art. XIII, § 3; *Minnesota Statutes Sections 135A.034 and 135A.06*. In addition, the Regents are obligated to unrestrictively divulge, to the State Commissioner of Finance, any and all books, accounts, documents and property that the Commissioner should choose to inspect. *Minnesota Statutes Section 137.0251*.

Furthermore, by operation of statute, the University is required to provide a variety of services for the benefit of the State's populace, and these obligations serve as additional corroboration of the vital nexus which extends between the two entities. The University's libraries serve as the depository of all books, pamphlets, maps and other works

135 L.Ed.2d 1047 (1996). In our view, this distinction, between common law and Eleventh Amendment immunity, weighs heavily against

the arguments that the Plaintiffs would have us accept.

published by or under the authority of the State. *Minnesota Statutes Section 137.04.* The University is required to maintain a research institute that is singularly devoted to the development and promotion of the State's products and its natural resources. *Minnesota Statutes Section 137.11.* Further, the University is required to establish and maintain an extension service, whose purpose it is to develop and implement an ongoing program to foster rural health and safety, see, *Minnesota Statutes Section 137.34,* and the University's Medical School is statutorily mandated to foster and train primary care physicians, for service in Minnesota's medically underrepresented regions. *Minnesota Statutes Section 137.38(3).*

Finally, and not insignificantly, the University remains financially dependent upon the State. The University lacks the authority to levy taxes, and it receives approximately one-third of its unrestricted funding from the State—a figure that requires an annual State expenditure of several hundred million dollars. See, *University of Minnesota Annual Report,* at 20 (attached as *Exhibit B, Affidavit of Leslie A. Gelhar*). By statute, the State is required to appropriate 67 percent of the estimated total cost of student instruction at the University, see, *Minnesota Statutes Section 135A.031* and, pursuant to a statutory formula, the State is obliged to allocate additional sums to subsidize its share of the University's noninstructional expenses. See, *Minnesota Statutes Section 135A.032.* In addition, the State has issued millions of dollars of bonding to finance the University's capital improvements, see, *University of Minnesota Annual Report,* at 25, 28, and these bonds, as well as the University's other debt instruments, see *Id.* at 25, are backed by the full faith and credit of Minnesota's treasury. *Affidavit of Roger Paschke,* at ¶¶ 3–4. Accordingly, we reach the inescapable conclusion that, in founding and maintaining the University of Minnesota, "the State has created an institution of higher learning 'that is dependent upon and functionally integrated with the state treasury.'" *Hadley v. North Arkansas Community Technical College,* supra at 1441, quoting *Kashani v. Purdue University,* 813 F.2d 843, 846 (7th Cir.1987), cert. denied, 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987).[8]

Therefore, notwithstanding the Plaintiffs' suggestion to the contrary, we are not persuaded that the relationship that currently exists between the State and the University,

---

**8.** In a related contention, citing *Sherman v. Curators of the University of Missouri,* 16 F.3d 860, 865 (8th Cir.1994), the Plaintiffs contend that the University is not entitled to Eleventh Amendment immunity because any judgment against it in this case could be satisfied by funds which have not directly emanated from the State treasury. Although *Sherman* did contain a discussion which could support such a contention, in *Hadley v. North Arkansas Community Technical College,* 76 F.3d 1437, 1441 (8th Cir.1996), the Court revisited this issue and foreclosed the argument which the Plaintiffs advance here:

> [The Plaintiff] argues that he seeks damages of less than $250,000 and therefore any award could be paid from other sources, such as future local tax increases, tuition, federal grants, or other discretionary funds. However, while there is dictum in Sherman suggesting it is relevant "whether a judgment against the University can be paid from non-state funds under the University's discretionary control," 16 F.3d at 865 (emphasis added), traditional Eleventh Amendment cases did not require a speculative analysis of whether a college largely funded by the State might be able to pay a judgment in the first instance from other sources, and [*Greenwood v. Ross,* 778 F.2d 448 (8th Cir.1985)] and Sherman were not departures from prior Eleventh

Amendment jurisprudence. See *Treleven v. University of Minnesota,* 73 F.3d 816, 818–19 (8th Cir.1996). [*Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977)] directs us to examine "the nature of the entity," * * *, not the nature of the relief the plaintiff seeks.

>     *    *    *    *    *    *

> The relevant funding inquiry cannot be whether [the defendant] enjoys some non-state funding, such as user fees (tuition), because then most state departments and agencies, and all state universities, would be denied Eleventh Amendment immunity. Here, even if [the defendant] could initially satisfy a judgment from other operating revenues, such as federal grants, the judgment would produce a higher operating shortfall that must, by state law, be satisfied by an appropriation from the state treasury. Thus, [the plaintiff's] action "is in essence one for recovery of money from the state." [*Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 463–64, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)].

[Footnote omitted].

This analysis bears equal application here.

has been so fundamentally transformed, over the last 25 years, as to produce a different result in *Treleven.* The University continues to be "an arm of the State," for Eleventh Amendment purposes, and we continue to be bound by the precedential authorities of this Circuit that have repeatedly so concluded. Finding the University to be an instrumentality of the State, we proceed to the remaining issues before us.

    2) *There are No Unique or Special Circumstances Which Warrant a Finding that the University Does Not Enjoy Eleventh Amendment Immunity in this Action.*

    ■ Alternatively, the Plaintiffs argue that the University is not entitled to Eleventh Amendment immunity—in this action alone—because of the unique and special circumstances that are here present, and that arise from the proprietary nature of the Hospital and Clinic, and the University's involvement in the MALG Program.

    In support of this argument, the Plaintiffs rely heavily upon the Ninth Circuit's decision in *Doe v. Lawrence Livermore National Laboratory,* 65 F.3d 771 (9th Cir.1995), cert. granted sub nom., *Regents of University of California v. John Doe,* —— U.S. ——, 116 S.Ct. 2522, 135 L.Ed.2d 1047 (1996). In *Doe,* the plaintiff brought a breach of an employment contract claim against the University of California and a laboratory that was owned by the United States Department of Energy, and was operated by the University. The University sought a dismissal of the action on Eleventh Amendment immunity grounds, and the District Court granted the Motion, causing the Plaintiff to appeal. By distinguishing a wealth of authority, which had concluded that the University was an Eleventh Amendment instrumentality, see, e.g., *Hamilton v. Regents of the University of California,* 293 U.S. 245, 257, 55 S.Ct. 197, 201–02, 79 L.Ed. 343 (1934); *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1443 (9th Cir.1989); *BV Engineering v. University of California, Los Angeles,* 858 F.2d 1394, 1395 (9th Cir.1988), cert. denied, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 859 (1989), a divided panel reversed the decision of the District Court, and held that the University, "in this specific instance, [was] not entitled to Eleventh Amendment immunity from suit in federal court * * *." *Doe v. Lawrence Livermore National Laboratory,* supra at 776. In so concluding, the Court found it determinative that the Department of Energy was contractually bound to indemnify the University for any damages that could be awarded in the underlying suit. *Id.* at 774.[9] Accordingly, the Court concluded that the District Court erred in ruling "that the University is *always* immune from suit in federal court." *Id.* at 775 [Emphasis in original].

    Although the Plaintiffs urge us to follow the reasoning of *Doe,* we decline to do so for two reasons. First, the Plaintiffs have not drawn our attention to any provision that would allow for the indemnification of the University here, as was the case in *Doe.*[10]

---

9. The Court also premised its holding upon three other factors which, purportedly, were inconsistent with a finding of immunity:
    (1) the University's capacity to sue and be sued;
    (2) the University's power to take property in its own name; and
    (3) the University's corporate status under the California Constitution.
*Doe v. Lawrence Livermore National Laboratory,* 65 F.3d 771, 775 (9th Cir.1995), cert. granted sub nom., *Regents of University of California v. John Doe,* —— U.S. ——, 116 S.Ct. 2522, 135 L.Ed.2d 1047 (1996). Nevertheless, as the dissent in *Doe* observed, these three attributes of the University's autonomy had not changed since the Court's prior decisions which had found it to be an Eleventh Amendment instrumentality. *Id.* at 777 (Canby, J., dissenting). Accordingly, we conclude that the controlling factor in the majority's analysis

. was the Department of Energy's obligation to indemnify the University.

10. The Plaintiffs have argued that the University's purchase of liability insurance will insulate it from any damage award here. We disagree. As the Ninth Circuit has held:

> The source of any damages to which the appellant might become entitled would be state funds even if paid by an insurance carrier. Such carriers would pay only because of *premiums paid by the state.* The Eleventh Amendment immunity should not be made to turn on whether or not the state is a self-insurer.

*Markowitz v. United States,* 650 F.2d 205, 206 (9th Cir.1981); accord, *In re San Juan Dupont Plaza Hotel Fire Litigation,* 888 F.2d 940, 945 (1st Cir.1989); *Mohammed v. Farney,* 832 F.Supp. 103, 105 (S.D.N.Y.1993).

Second, we disagree with the Ninth Circuit's view that a State instrumentality's Eleven Amendment immunity will be dependent upon the peculiar facts of each, individual case. As we have noted elsewhere, this is not the law of this Circuit,[11] nor have the Plaintiffs demonstrated that the *Doe* decision has support in Supreme Court precedent.[12]

Accordingly, finding no merit in the arguments that the Plaintiffs have advanced, we conclude that the University continues to be, in all respects, an arm of the State of Minnesota for purposes of the Eleventh Amendment, and the immunity that Amendment affords.

### 2. Has the University Waived its Eleventh Amendment Immunity?

Next, the Plaintiffs argue that the University has waived its Eleventh Amendment immunity, either expressly, by the State's enactment of the Minnesota Tort Claims Act, or constructively, by its involvement with the MALG Program, which was Federally regulated. We examine each of these contentions in turn.

#### a. The Assertion of an Express Waiver.

1) *Standard of Review.* The immunity from suit, which is afforded by the Eleventh Amendment, has no application where a State has expressly consented to suit and, thereby, has waived its immunity. See, e.g., *Port Authority Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06, 110 S.Ct. 1868, 1872–73, 109 L.Ed.2d 264 (1990); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 3145–46, 87 L.Ed.2d 171 (1985). Nevertheless, a State will be deemed to have explicitly waived its immunity "only

where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974), quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464–65, 53 L.Ed. 742 (1909); see also, *Thomas v. FAG Bearings Corp.*, supra at 506 ("As a general matter, only unmistakable and explicit waiver by the state itself qualifies as a waiver of Eleventh Amendment immunity."). Moreover, "[a] State does not waive its Eleventh Amendment immunity by consenting to suit only in its courts, * * * and '[t]hus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court.*'" *Port Authority Trans–Hudson Corp. v. Feeney*, supra at 306, 110 S.Ct. at 1873, quoting *Atascadero State Hospital v. Scanlon*, supra at 241, 105 S.Ct. at 3146–47 [emphasis in original] [internal citations omitted]. Strict construction of State waivers of immunity is necessitated by a concern that, absent such stringency, "federal courts may mistake a provision intended to allow suit in a State's own courts for a waiver of sovereign immunity." *Id.* at 307, 110 S.Ct. at 1874.

2) *Legal Analysis.* In arguing that the State and, therefore, the University, have waived their Eleventh Amendment immunity, the Plaintiffs rely upon the waiver provisions of the Minnesota Tort Claims Act which, as here pertinent, read as follows:

Subdivision 1. General rule. The State will pay compensation for injury to or loss

---

As a consequence, States and their instrumentalities have been held to be entitled to Eleventh Amendment immunity notwithstanding their purchase of liability insurance. See, *In re San Juan Dupont Plaza Hotel Fire Litigation*, supra; *Westinghouse Electric Corp. v. West Virginia Department of Highways*, 845 F.2d 468, 471 (4th Cir. 1988), cert. denied, 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 116 (1988); *Cannon v. University of Health Sciences/The Chicago Medical School*, 710 F.2d 351, 357 (7th Cir.1983); *Markowitz v. United States*, supra; *Mohammed v. Farney*, supra. Similarly, such a purchase has been held to not constitute a waiver of the State's immunity. See, *In re San Juan Dupont Plaza Hotel Fire Litigation*, supra; *Westinghouse Electric Corp. v. West*

*Virginia Department of Highways*, supra; *Markowitz v. United States*, supra; *Mohammed v. Farney*, supra.

**11.** See supra, footnote 7, and accompanying text.

**12.** The question presented through the Writ of Certiorari is as follows:

May entity that would otherwise be considered "arm of state" immune from suit under Eleventh Amendment lose its immunity when it has claim for reimbursement or indemnity from federal government or other third party?

*Regents of University of California v. John Doe,* —— U.S. ——, 116 S.Ct. 2522, 135 L.Ed.2d 1047.

of property or personal injury or death caused by an act or omission of an employee of the state while acting within the scope of office or employment * * * under circumstances where the state, if a private person, would be liable to the claimant, whether arising out of a governmental or proprietary function. * * *.

Subdivision 2. Procedure. Claims of various kinds shall be considered and paid only in accordance with the statutory procedures provided. If there is no applicable statute, *a claim shall be brought under this section as a civil action in the courts of the state.*

*Minnesota Statutes Section 3.736* [emphasis added].

In construing this provision, the Court in *DeGidio v. Perpich,* 612 F.Supp. 1383, (D.Minn.1985), was presented with a waiver argument that is identical to that advanced by the Plaintiffs here. Although accepting that Minnesota had waived its sovereign immunity—at least to some extent—by Section 3.736, the Court nonetheless concluded that "the language of subdivision 2 of that section does not clearly show that Minnesota intended to waive any claim of sovereign immunity in federal court." *Id.* at 1389 [footnote omitted]. Accordingly, the Court found that the State had not waived its Eleventh Amendment immunity by its enactment of Section 3.736.

The Plaintiffs urge us, however, to reject the Court's analysis in *DeGidio* and follow, instead, the Court's analysis in *In re Hololo,* 512 F.Supp. 889 (D.Haw.1981). There, under closely analogous circumstances, the Court found an express waiver of Eleventh Amendment immunity in the language of two Hawaiian statutes which, when read together, bear a close resemblance to the language of Section 3.736.[13] We find, however, that the Court's analysis in *In re Hololo* has been effectively undermined by the intervening pronouncements of the United States Supreme Court. In particular, the Supreme Court has insisted that, to be effective, a purported express waiver of Eleventh Amendment immunity must specify the State's intention to subject itself to suit in the Federal Courts. See, *Port Authority Trans–Hudson Corp. v. Feeney,* supra at 306, 110 S.Ct. at 1873; *Welch v. Texas Highways & Public Transport Department,* 483 U.S. 468, 473–74, 107 S.Ct. 2941, 2945–46, 97 L.Ed.2d 389 (1987); *Atascadero State Hospital v. Scanlon,* supra at 241, 105 S.Ct. at 3146–47; *Pennhurst State School and Hospital v. Halderman,* supra at 99, 104 S.Ct. at 907; *Florida Department of Health v. Florida Nursing Home Association,* 450 U.S. 147, 150, 101 S.Ct. 1032, 1034–35, 67 L.Ed.2d 132 (1981). No such intention, to subject the State of Minnesota to suits in the Federal Courts, is embodied in the general waiver provisions of Section 3.736 nor, incidentally, do we find that such an intention can be properly inferred from the relevant statutory provisions in *In re Hololo.*[14]

---

**13.** The statutory provisions, that were construed by the Court in *In re Hololo,* 512 F.Supp. 889 (D.Haw.1981), then provided, in pertinent part, as follows:

> The State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages. The circuit courts of the State and, except where otherwise provided by statute or rule, the district courts shall have original jurisdiction of all tort actions on claims against the State, for money damages, accruing on or after July 1, 1957 for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the State while acting within the scope of his office or employment.

*Hawaii Revised Statutes, Sections 662–2 and 662–3* (1976), quoted in *In re Hololo,* supra at 896.

**14.** While somewhat extraneous to our analysis, this conclusion is bolstered by the amendment of the Hawaii Tort Claims Act, which the Hawaiian Legislature enacted, in response to the Court's decision in *In re Hololo,* 512 F.Supp. 889 (D.Haw.1981), and which provided as follows:

> The purpose of this Act is to expressly restate, reiterate, and declare the intent of the legislature in amending sections 661–1 and 662–3, Hawaii Revised Statutes, in 1978 to extend jurisdiction to district courts in tort actions on claims against the State, was originally and is now to extend jurisdiction for such actions and claims against the State to state district courts, and not to extend jurisdiction for such actions and claims to federal district courts. This Act is a response to the court's erroneous interpre-

In this respect, we are closely guided by the Court's decision in *Port Authority Trans–Hudson Corp. v. Feeney,* supra. There, the Court assumed, without deciding, that the entity in question enjoyed Eleventh Amendment immunity[15] but, nevertheless, found a valid expression of the entity's intent to subject itself to suit in Federal Court, in the following statutory language:

> The foregoing consent is granted upon the condition that venue in any suit, action or proceeding against the Port Authority shall be laid within a county or judicial district, established by one of the States *or by the United States,* and situated wholly or partially within the Port of New York District.

*New Jersey Revised Statutes, Section 32:1– 162, New York Unconsolidated Laws, Section 7106,* quoted in *Port Authority Trans– Hudson Corp. v. Feeney,* supra at 303, 110 S.Ct. at 1871–72.

The statute in *Feeney,* therefore, evidences the State entity's contemplation of, and consent to, suit in a Federal Court. In contrast, Section 3.736 offers no similar evidentiary showing.

Accordingly, we decline to follow *In re Holoholo,* supra,[16] but adopt, instead, the Court's careful analysis in *DeGidio* which, in our view, faithfully adheres to the restrictive application, of the express waiver doctrine, consistent with the rulings of the Supreme Court. Therefore, we conclude that, by enacting Section 3.376, neither the State, nor the University, expressly waived its immunity under the Eleventh Amendment.

### b. *Constructive Waiver.*

1) *Standard of Review.* The relevant decisions of the Supreme Court reflect that, under certain narrow and quite exceptional circumstances, a State may be deemed to have constructively waived its immunity under the Eleventh Amendment. At its high-water mark, the doctrine of constructive waiver was expressed in *Parden v. Terminal Railway of Alabama State Docks Department,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), where the Court considered whether the State of Alabama's operation of a railroad subjected it to suit in Federal Court under the Federal Employers' Liability Act ("FELA"), see *Title 45 U.S.C. § 51 et seq.* Notwithstanding the State's express disclaimer of any consent to be sued, the Court held that the State's election to operate a railroad, in the preemptive radiance of the FELA, constituted a constructive consent to be sued in Federal Court. In the words of the Court:

> Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act. By adopting and ratifying the Commerce Clause, the States empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit.

*Id.,* at 192, 84 S.Ct. at 1213.

In subsequent years, however, the Court drastically circumscribed the reach of the constructive waiver doctrine. Thus, in *Employees of the Department of Public Health*

---

tation of section 662–3, Hawaii Revised Statutes, in *In Re Holoholo,* 512 F.Supp. 889 (D.Haw.1981).

*Act 135, 1984 Haw. Sess. Laws 258,* quoted in *Bator v. State of Hawaii,* 1992 WL 690295 at *10 n. 2 (D.Haw., May 20, 1992), aff'd, 39 F.3d 1021 (9th Cir.1994).

We cite this legislative history in view of the Plaintiffs' pointed reliance upon the Court's analysis and decision in *In re Holoholo.*

**15.** In a subsequent decision, the Court held that the same entity was not entitled to Eleventh Amendment immunity. See, *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

**16.** We note that, as an alternative to its finding of express consent, the Court in *In re Holoholo* found that the defendants had waived their Eleventh Amendment immunity "by overwhelming implication," through the provisions of a contract to which they were a party. *Id.* at 899–902. Without addressing the propriety of this finding, we note that no similar contract is at play in this action.

& Welfare v. Department of Public Health & Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Court held that a constructive waiver of Eleventh Amendment immunity should only be found—if at all—in those circumstances where there is an explicit statement by Congress that it intended to expose the States to liability in Federal Court if they engaged in a particular activity, and the activity itself was of a sort that a State might voluntarily elect to implement. Id. at 284–86, 93 S.Ct. at 1617–19. Hence, a State could not be sued, in its role as an employer of government workers, in order to enforce its compliance with the Fair Labor Standards Act, see, Title 29 U.S.C. § 201 et seq., as that Statute contained no explicit congressional statement of potential State liability and, the States would have no real discretion in employing workers to provide basic governmental services. Id.

Applying this same principle in subsequent decisions, the Court refused to find a constructive State waiver of Eleventh Amendment immunity in cases arising under the Social Security Act, see Edelman v. Jordan, supra at 653, 94 S.Ct. at 1351; the Medicaid Act, see Florida Department of Health v. Florida Nursing Home Association, supra at 150, 101 S.Ct. at 1034–35; the Rehabilitation Act of 1973, see Atascadero State Hospital v. Scanlon, supra at 246–47, 105 S.Ct. at 3149–50; and the Jones Act, see Welch v. Texas Highways & Public Transport Department, supra at 475–76, 107 S.Ct. at 2946–47. Indeed, in Welch, the Court expressly overruled that portion of its earlier decision in Parden, which had found a constructive consent in the context of the FELA.

In sum, the rarity of a State's constructive waiver of its Eleventh Amendment immunity cannot be overstated. Edelman v. Jordan, supra at 653, 94 S.Ct. at 1351 ("Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights * * *.").

■■■ 2) Legal Analysis. With the foregoing as a backdrop, we conclude that the University has not constructively waived its Eleventh Amendment immunity. Although the Plaintiffs assert that the University's participation in the MALG Program, which was a Federally regulated experimental drug program, evinces a constructive waiver of immunity, we are not so persuaded.

Without dispute, the University's MALG Program was regulated by the FDA under the Federal Drug and Cosmetic Act ("FDCA"), see Title 21 U.S.C. § 301 et seq., and the Public Health Services Act ("PHSA"), see Title 42 U.S.C. § 201 et seq. See also, 21 C.F.R. § 312; United States v. Najarian, 915 F.Supp. 1460, 1471–72 (D.Minn.1996). Nevertheless, we have thoroughly examined these Statutes, and can find nothing in their text which evidences a congressional intent to subject a State to a waiver of its Eleventh Amendment immunity if that State should elect to enter the field of drug manufacture. In the absence of such an explicit congressional statement, we are unable to conclude that the University has constructively waived its Eleventh Amendment immunity through its participation in the MALG Program.[17]

3. Has Congress Abrogated the University's Eleventh Amendment Immunity?

17. As additional support for their constructive waiver argument, the Plaintiffs again rely upon In re Holoholo, supra. There, the Court found, as an alternative basis for denying Eleventh Amendment immunity, that the Defendants had constructively waived their immunity by operating a vessel on the navigable waters of the United States, thereby subjecting itself to liability under the Jones Act, see, Title 46 U.S.C.App. § 688, and the Death on the High Seas Act, see, Title 46 U.S.C.App. § 761 et seq. Id. at 902–07. In reaching this conclusion, the Court did not make an express finding that either of these Statutes contained an explicit statement of congressional intent to subject the States to a waiver of their Eleventh Amendment immunities, but relied, instead, upon the since discredited constructive consent analysis that was contained in Parden v. Terminal Railway of Alabama State Docks Department, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Such reasoning no longer reflects the current state of the law. Indeed, since In re Holoholo, the Supreme Court has expressly rejected the Jones Act as a basis for constructive waiver. See, Welch v. Texas Highways & Public Transport Department, 483 U.S. 468, 475–76, 107 S.Ct. 2941, 2946–47, 97 L.Ed.2d 389 (1987). Therefore, we reject In re Holoholo as persuasive authority on, among other questions, the issue of constructive waiver.

Lastly, we consider whether Congress has abrogated the University's Eleventh Amendment immunity.[18]

■ a. *Standard of Review.* Through congressional abrogation, a plaintiff may proceed against a State, or against a State instrumentality, notwithstanding the Eleventh Amendment's grant of immunity, when the following three factors are present:

(1) the action must be brought pursuant to a Federal law;

(2) Congress must have expressed its intent to abrogate the State's Eleventh Amendment immunity within the body of that law; and

(3) in enacting the law abrogating immunity, Congress must have acted pursuant to a constitutional grant of authority which bestows upon it the power to abrogate.

*Seminole Tribe of Florida v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1123, 134 L.Ed.2d 252 (1996).

Furthermore, a congressional intent to abrogate, must be "unequivocally expresse[d]." *Seminole Tribe of Florida v. Florida,* supra at ——, 116 S.Ct. at 1123, citing *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985); see also, *Atascadero State Hospital v. Scanlon,* supra at 242, 105 S.Ct. at 3147 ("Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.").

■ Accordingly, Congress may only abrogate Eleventh Amendment immunity when acting pursuant to a constitutional provision which empowers it to abrogate. Thus, Congress may exercise its enforcement authority under Section 5 of the Fourteenth Amendment to abrogate the States' Eleventh Amendment immunity, see *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), but Congress may not abrogate immunity when enacting legislation in accordance with the powers vested by Article I of the Constitution. *Seminole Tribe of Florida v. Florida,* supra at —— ——, 116 S.Ct. at 1127–28.

■ b. *Legal Analysis.* Given these precepts, we conclude that Congress has not waived the University's immunity from suit in this action. First, in this proceeding, the Plaintiffs have not raised a claim which is premised upon Federal law. While they have alleged that the Defendants' purported failure to comply with certain FDA standards constituted negligence *per se,*[19] it is well-settled that a State law cause of action, which merely incorporates Federal law as an element, does not arise under Federal law. See, e.g., *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 817, 106 S.Ct. 3229, 3236–37, 92 L.Ed.2d 650 (1986); *Gaming Corporation of America v. Dorsey & Whitney,* 88 F.3d 536 (8th Cir.1996).

Moreover, even if the Defendants' purported failure to comply with the FDA standards did give rise to a claim under the Federal law, we would still be compelled to conclude that no congressional abrogation had occurred in this instance. As noted, the MALG Program was regulated by the FDA, pursuant to authority granted through the FDCA and the PHSA. Neither of these Statutes contains the necessary "unequivocal expression" of congressional intent that is necessary to abrogate the States' Eleventh Amendment immunity. Furthermore, and far more fundamentally, Congress could not, under these circumstances, abrogate the

18. While the issue of congressional abrogation has not been squarely raised by the Plaintiffs, the doctrine is closely intertwined with other aspects of Eleventh Amendment immunity—and, in particular, the concept of constructive waiver—which the Plaintiffs have addressed. As a consequence, in the interests of completeness, we briefly address the abrogation doctrine.

19. Under Minnesota law, for a plaintiff to recover for negligence *per se,* the following elements must be proved:

(1) that the plaintiff is in a class for whose benefit a statute, which does not create a purely public duty, was designed;

(2) that there was a violation of the statute by the defendant; and

(3) that the plaintiff suffered damages as the proximate result of such violation.

See, e.g., *Pacific Indem. Co. v. Thompson–Yaeger, Inc.,* 260 N.W.2d 548, 558 (Minn.1977); *Medved v. Doolittle,* 220 Minn. 352, 19 N.W.2d 788 (1945); *Erickson v. Morrow,* 206 Minn. 58, 287 N.W. 628 (1939).

States' immunity by its enactment of either the FDCA or the PHSA. Each of these Statutes was enacted as an exercise of Congress' power to regulate interstate commerce, see e.g., *United States v. Walsh,* 331 U.S. 432, 67 S.Ct. 1283, 91 L.Ed. 1585 (1947); *Carnohan v. United States,* 616 F.2d 1120 (9th Cir.1980); *United States v. Ellis Research Laboratories, Inc.,* 300 F.2d 550 (7th Cir.1962), cert. denied, 370 U.S. 918, 82 S.Ct. 1558, 8 L.Ed.2d 499 (1962); *State of Louisiana v. Mathews,* 427 F.Supp. 174 (E.D.La. 1977), and Congress may not abrogate Eleventh Amendment immunity pursuant to an exercise of its power under the Commerce Clause, or through any other power that has been conferred by Article I of the Constitution. *Seminole Tribe of Florida v. Florida,* supra.

Therefore, finding the Plaintiffs' arguments in opposition to the University's Motion to be unavailing, we recommend that the Motion to Dismiss be granted.

NOW, THEREFORE, It is—

RECOMMENDED:

That the University's Motion to Dismiss [Docket Nos. 4 and 14] be granted.

July 29, 1996.